In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 06-2982

TERRANCE JEWETT,

*Plaintiff-Appellee,*

*v.*

OFFICER DALE ANDERS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 867—**Charles N. Clevert, Jr.,** *Judge.*

———————

ARGUED SEPTEMBER 27, 2007—DECIDED APRIL 11, 2008

———————

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Terrance Jewett filed this action
under 42 U.S.C. § 1983 against Officer Dale Anders, a
Milwaukee police officer. He alleges that Officer Anders
unlawfully arrested him and used excessive force in
effectuating the arrest in violation of the Fourth Amend-
ment, as made applicable to the states by the Fourteenth
Amendment. He also alleges that Officer Anders de-
prived him of liberty without due process of law in viola-
tion of the Fourteenth Amendment. Officer Anders
filed a motion for partial summary judgment on the
unlawful arrest and deprivation of liberty claims. He also

asserted qualified immunity with respect to these allega-
tions. The district court denied his motion. Officer Anders
then timely filed an interlocutory appeal in this court.

For the reasons set forth in this opinion, we reverse
the judgment of the district court.

## I

## BACKGROUND

### A.

In this interlocutory appeal from a denial of qualified
immunity on summary judgment, we have jurisdiction to
consider only the purely legal question of whether, for
purposes of Officer Anders' qualified immunity defense,
a given set of facts demonstrates a violation of clearly
established constitutional law. *Leaf v. Shelnutt*, 400 F.3d
1070, 1078 (7th Cir. 2005). Accordingly, we must rest our
analysis on the facts asserted by the plaintiff, Mr. Jewett,
*see Knox v. Smith*, 342 F.3d 651, 656 (7th Cir. 2003) (noting
that, where "one side concedes the other's facts as to
what happened," the qualified immunity question becomes
a question of law), or assumed by the district court in its
denial of summary judgment, *Washington v. Haupert*, 481
F.3d 543, 549 n.2 (7th Cir. 2007) (explaining that we may
"take, as given, the facts that the district court assumed
when it denied summary judgment" (quoting *Johnson v.
Jones*, 515 U.S. 304, 319 (1995))); *McKinney v. Duplain*, 463
F.3d 679, 688 (7th Cir. 2006); *Leaf*, 400 F.3d at 1078-79.

On December 21, 2003, the Milwaukee Police Depart-
ment was investigating an attempted homicide that had
occurred the previous day. In connection with this investi-
gation, Officer Dale Anders was ordered to meet several

other officers at the Wal-Mart store on Capitol Drive and 60th Street. The officers were under instructions to apprehend Andre Thompson, who worked in the automotive department of the Wal-Mart. The Milwaukee police suspected that Thompson had been the perpetrator of the previous day's shooting; the officers had been advised that Thompson was armed.[1]

Officer Anders and his partner, both of whom were in full police uniform, arrived at the Wal-Mart in a marked police vehicle. Officer Anders parked the squad car in a position west of the store. While in the Wal-Mart parking lot, he observed an individual peer out of a door located at the south side of the Wal-Mart building. Shortly thereafter, he observed a young black male exit the Wal-Mart through a door located on the north side of the building; this individual subsequently was identified as Terrance Jewett. This sequence of events caused Officer Anders to become suspicious. Believing that Mr. Jewett might be Thompson, Officer Anders started following him in the marked police car. As Officer Anders neared, Mr. Jewett turned and ran back toward the Wal-Mart.

Upon seeing Mr. Jewett run, Officer Anders exited his vehicle and ordered him to stop. Officer Anders claims that he identified himself as a police officer; Mr. Jewett maintains that he heard someone yelling for him to stop but that the individual did not identify himself as a police officer.

---

[1] Officer Anders submitted an affidavit to the district court stating: "Officers had been advised that we were to proceed to [the Wal-Mart] to look for and apprehend one Andre Thompson, who had a birth date of January 24, 1981, and who had a physical description of being a black male, 6'3" tall, and approximately 216 pounds." R.27 ¶ 4, at 1.

Mr. Jewett continued running until he reached the Wal-Mart door and then started to pound frantically on it.

Having caught up with Mr. Jewett, Officer Anders claims that he believed that he and his partner were in a dangerous situation. Mr. Jewett had failed to obey his commands. Moreover, the Officer believed that Mr. Jewett was Thompson and, on the basis of the earlier briefing, that he was armed. Consequently, Officer Anders sought to bring Mr. Jewett within his physical control by performing a "wall stun" on Mr. Jewett: he placed his hands against the middle of Mr. Jewett's back and pushed his chest against the door. R.26 ¶ 31. Officer Anders then put his forearms under Mr. Jewett's armpits and pulled him toward the ground. When he had Mr. Jewett face down on the ground, Officer Anders grabbed Mr. Jewett's hands, brought them behind his back and handcuffed him.

Once he had secured Mr. Jewett in handcuffs, Officer Anders conducted a search of his person. The Officer retrieved Mr. Jewett's identification from his pocket, which identified him as Terrance Jewett rather than Andre Thompson. Officer Anders placed Mr. Jewett inside the squad car. At this point, Sergeant Pamela Holmes arrived on the scene and spoke briefly with Mr. Jewett. Officer Anders confirmed Mr. Jewett's identification and issued him a municipal citation for obstructing a police officer based on Mr. Jewett's failure to obey his commands to stop.[2] Officer Anders then released Mr. Jewett. According to Mr. Jewett, the incident lasted approximately thirty

---

[2] Mr. Jewett was cited for violating Milwaukee Code of Ordinances § 105-138, entitled "Resisting or Obstructing an Officer." The citation eventually was dismissed by the City of Milwaukee on its own motion.

to forty minutes; Officer Anders claims that Mr. Jewett was detained for twenty minutes.

**B.**

Mr. Jewett filed this section 1983 action against Officer Anders. Specifically, Mr. Jewett claims that Officer Anders arrested him unlawfully and used excessive force to effectuate the arrest in violation of the Fourth Amendment, as made applicable to the states by the Fourteenth Amendment. Mr. Jewett also claims that Officer Anders deprived him of liberty without due process of law in violation of the Fourteenth Amendment.[3] Officer Anders moved for summary judgment on qualified immunity grounds and on the merits with respect to all claims except for the excessive force claim. The district court denied his motion.

The district court determined that there was no evidence that Officer Anders had the physical description of the suspected perpetrator of the December 20th attempted homicide that he was investigating. The district court noted that

> [i]n his affidavit, Officer Anders states that "Officers had been advised that we were to proceed to [Wal-Mart], to look for and apprehend one Andre Thomp-

---

[3] Mr. Jewett's complaint states: "Plaintiff was denied his right to due process not to be deprived of liberty without due process of law when he was shoved against a door, searched, thrown to the ground, tightly cuffed, and forced to sit on his hands in a squad car even after the officers were aware that he was not involved in any crime." R.1 ¶ 44.

> son, who had a birth date of January 24, 1981, and who had a physical description of being a black male, 6'3" tall, and approximately 216 pounds."

R.37 at 4 n.1. The court ruled, however, that this assertion constituted inadmissible hearsay. As a result, it determined that Officer Anders had no other basis for comparing Mr. Jewett's physical characteristics with the description of Thompson. The district court then concluded that Officer Anders did not have probable cause to arrest Mr. Jewett solely based on Mr. Jewett's location, the automotive department of Wal-Mart and his attempt to escape after being commanded to stop by Officer Anders. The court accordingly denied Officer Anders' motion for summary judgment on the unlawful arrest claims.

Next, the district court analyzed whether Officer Anders was entitled to qualified immunity. The court set forth the appropriate standard under *Saucier v. Katz*, 533 U.S. 194, 202 (2001). It ruled that Mr. Jewett had a clearly established constitutional right to be free from arrest without probable cause and that Officer Anders had not presented sufficient evidence to enable the court to decide that he did not violate that right. The district court accordingly denied Officer Anders' motion for summary judgment.

## II

## DISCUSSION

### A.  Standard of Review

We review de novo a district court's denial of summary judgment on qualified immunity grounds. *Sullivan v.*

*Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004). In conducting our review, we do not evaluate the weight of the evidence, judge the credibility of witnesses or determine the ultimate truth of the matter; rather, we determine whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

**B. Interlocutory Jurisdiction**

Although a district court's denial of summary judgment usually is an unappealable interlocutory order, an "exception to this general rule exists for a district court's denial of qualified immunity on summary judgment." *White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007). In reviewing a district court's denial of qualified immunity, we cannot "make conclusions about which facts the parties ultimately might be able to establish at trial." *Leaf*, 400 F.3d at 1078. Nor may we "reconsider the district court's determination that certain genuine issues of fact exist." *Id.* Our interlocutory jurisdiction extends only to those "abstract issues of law," *Johnson*, 515 U.S. at 317, which do not "depend on the outcome of a disputed factual question." *Leaf*, 400 F.3d at 1078. In sum, this "[c]ourt's jurisdiction extends to interlocutory appeals . . . challenging a district court's determination that a set of facts demonstrate a violation of 'clearly established' constitutional law and preclude the defendants from proffering

a qualified immunity defense." *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006) (internal quotation marks and citation omitted).

Because of this limitation on our interlocutory jurisdiction, our review of a denial of qualified immunity is framed either by the facts as assumed by the district court or by the facts as set forth by the plaintiff. *White*, 509 F.3d at 833-34. Here, Officer Anders is not challenging the district court's determination about the sufficiency of the evidence, and he has accepted the facts as assumed by the district court and as set forth by Mr. Jewett. Therefore, because Officer Anders has made legal arguments based on these facts, *see id.* at 835-37, we are satisfied that we have jurisdiction over the case.

## C. The Qualified Immunity Framework

The doctrine of qualified immunity shields from liability public officials who perform discretionary duties. *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007). Public officials, police officers among them, often are called upon to make difficult decisions in high pressure and high risk situations. Inevitably, some of those decisions will be mistaken. Subjecting police officers to liability for each reasonable but ultimately mistaken decision would result in "unwarranted timidity," would deter talented candidates from becoming police officers and would result in lawsuits that distract officers from their duties. *Malinowski v. DeLuca*, 177 F.3d 623, 626 (7th Cir. 1999) (citing *Richardson v. McKnight*, 521 U.S. 399, 409, 411 (1997)). At the same time, there remains a "need to vindicate constitutional violations by government officials who abuse their offices." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). The

doctrine of qualified immunity strikes a balance between these conflicting concerns: It shields from liability police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Qualified immunity provides "ample room for mistaken judgments," and it protects all but the "plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (noting, in the excessive force context, that the "police cannot have the specter of a § 1983 suit hanging over their heads when they are confronted with a dangerous fugitive, possible escapee, or as long as their behavior falls within reasonable limits").

The Supreme Court of the United States has articulated a two-part test for qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; (2) whether that constitutional right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. Stated another way, qualified immunity will shield Officer Anders if he can "demonstrate that he was performing a discretionary function and that a reasonable law enforcement officer would have believed that, at the time he acted, his actions were within the bounds of the law." *Belcher*, 497 F.3d at 749; *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999).

Qualified immunity is an affirmative defense. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001). However, once the defense is raised, it becomes the plaintiff's burden to defeat it. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007); *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). If the plaintiff cannot establish that the facts,

taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right—the first step in the *Saucier* analysis—our inquiry ends, and summary judgment for the defendant is appropriate.

## D.  Officer Anders' Detention of Mr. Jewett

We now turn to the first step in the *Saucier* analysis and explore whether Officer Anders violated the constitutional rights of Mr. Jewett.

The first issue that we must decide is whether Officer Anders' detention of Mr. Jewett constitutes an investigatory *Terry* stop or a complete arrest. If Mr. Jewett's detention constituted only an investigatory stop, the Fourth Amendment requires the lower standard of reasonable suspicion. *United States v. Kirksey*, 485 F.3d 955, 957-58 (7th Cir. 2007); *see also Terry v. Ohio*, 392 U.S. 1 (1968).[4] If Mr. Jewett was arrested, then the Fourth Amendment requires the presence of probable cause. *United States v. Adamson*, 441 F.3d 513, 519-20 (7th Cir. 2006). There is no bright-line that separates a *Terry* investigatory stop from a formal arrest. *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). The distinction hinges on the intrusiveness of the detention, *id.*, which is a "flexible and highly fact-intensive" inquiry. *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004). In denying Officer Anders qualified

---

[4] Qualified immunity protects those officers who make a reasonable error in determining whether there is reasonable suspicion to conduct a *Terry* stop. *Lindsey v. Storey*, 936 F.2d 554, 559 (11th Cir. 1991); *see also Feathers v. Aey*, 319 F.3d 843, 850-51 (6th Cir. 2003); *Smith v. City of Chicago*, 242 F.3d 737, 742-43 (7th Cir. 2001).

immunity, the district court assumed that the detention was an arrest.

We begin by examining whether Officer Anders' actions, as alleged by Mr. Jewett, can be characterized as a constitutional investigatory stop authorized by *Terry*. Mr. Jewett had a right to be free from a *Terry* stop unless Officer Anders had reasonable suspicion. *Terry*, 392 U.S. at 30. To conduct a *Terry* stop, an officer must be "aware of specific and articulable facts giving rise to reasonable suspicion." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). Reasonable suspicion is more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). It requires "some minimal level of objective justification for making a stop," given the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Moreover, "a court's determination of reasonable suspicion 'must be based on common-sensical judgments and inferences about human behavior.'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Wardlow*, 528 U.S. at 125). Because reasonable suspicion is evaluated in light of the totality of the circumstances known to the officer, we have noted that certain "behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Finally, in evaluating the reasonableness of an investigatory stop, we examine first whether the "officer's action was justified at its inception" and, second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *United States v. Wilson*, 2 F.3d 226, 230 (7th Cir. 1993).

In determining whether Officer Anders' action was justified at its inception, we must consider whether it was based on the applicable standard of reasonable suspicion. The Supreme Court has considered whether an individual's unprovoked flight is sufficient to give the officer reasonable, particularized suspicion to warrant an investigatory stop. *Wardlow*, 528 U.S. at 124. In *Wardlow*, a caravan of police officers was converging on a high-crime area known for its heavy drug trafficking. As the police approached the area, an officer observed an individual look in the direction of the police caravan and then flee. The Court declined to adopt a per se rule as to whether headlong, unprovoked flight creates reasonable suspicion. *Id.* at 126 (Stevens, J., concurring in part and dissenting in part). The Court nevertheless explained that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124 (Rehnquist, C.J.). The Court held:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Id.* at 125.

In examining whether Officer Anders' actions were "reasonably related in scope to the circumstances which justified the interference in the first place," *Terry*, 392 U.S. at 20, we must keep in mind that an investigatory stop can involve a measured use of force. Indeed, we have

noted explicitly that a necessary corollary to the power of the police to conduct an investigatory stop is the ability to "use reasonable means to effectuate that stop." *United States v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001), *overruled on other grounds by statute; see also Graham v. Connor*, 490 U.S. 386, 396 (1989); *Weaver*, 8 F.3d at 1244 ("It is well-established that '[a] measured use of force . . . appropriate to accomplish the purposes of [the] investigatory stop' does not convert a *Terry* stop into an arrest." (quoting *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir. 1992))). However, an officer's use of force may escalate to the point where the encounter becomes, as a matter of law, a formal arrest. *See United States v. Weaver*, 8 F.3d at 1240, 1244 (7th Cir. 1993). In differentiating between the two, the touchstone is reasonableness: Were the officer's actions reasonable in light of all the circumstances? *Graham*, 490 U.S. at 396. In evaluating whether the force that an officer used to effectuate the investigatory stop was so disproportionate to the purpose of such a stop as to convert the encounter into a full arrest, we consider whether "the surrounding circumstances g[a]ve rise to a justifiable fear for personal safety" on the part of the officer, *Tilmon*, 19 F.3d at 1226; we also must consider "the defendant's own actions in resisting an officer's efforts." *Lawshea*, 461 F.3d at 860; *see also Weaver*, 8 F.3d at 1244 (noting that a "suspect cannot complain that [a] police officer took forcible steps to detain him when the suspect's own evasive actions created the need for those steps" (citing *Voida*, 963 F.2d at 958-59 & n.6)). Given the potential dangers involved in conducting investigatory stops, "*Terry* allows an officer to conduct a pat-down search if the officer has articulable facts that led him or her to believe that the individual could be armed or present a threat to others." *United States v. Hernandez-Rivas*, 348 F.3d 595,

599 (7th Cir. 2003); *see also Terry*, 392 U.S. at 27. As we have noted previously, "[t]o require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry*." *Stewart*, 388 F.3d at 1085 (internal quotation marks and citation omitted).

Turning to the case before us, we believe that Officer Anders' detention of Mr. Jewett, at the time that the Officer initiated the action, did not exceed the permissible bounds of an investigatory detention under *Terry*. We also believe that the measures employed by the Officer were reasonable when evaluated under the totality of the circumstances.

At the moment that he decided to conduct an investigatory stop of Mr. Jewett, Officer Anders was at the Wal-Mart to search for and arrest Andre Thompson. Thompson was suspected by the police of having perpetrated the shooting and attempted murder that had occurred the previous day. Officer Anders had been advised that Thompson could be armed, and he reasonably considered Thompson to be dangerous to himself, his partner and others.[5] Officer

---

[5] We pause briefly to address the district court's evidentiary ruling, which bears on Officer Anders' knowledge immediately prior to his detention of Mr. Jewett. The district court excluded Officer Anders' statement that "[o]fficers had been advised that we were to proceed to [the Wal-Mart] to look for and apprehend one Andre Thompson, who had a birth date of January 24, 1981, and who had a physical description of being a black male, 6'3" tall, and approximately 216 pounds." R.37 at 4 & n.1.

Our jurisdiction necessarily must extend to review of the district court's exclusion as inadmissible hearsay of Officer

(continued...)

_____

[5] (...continued)
Anders' testimony regarding the information that he received from his superiors when he was dispatched to the Wal-Mart to apprehend Andre Thompson. That issue is intertwined with the issue of qualified immunity, and its consideration is "necessary to ensure meaningful review of the qualified immunity question." *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (noting that a court of appeals' jurisdiction "over an interlocutory appeal of the denial of qualified immunity also provides a basis for consideration of other district court rulings that are 'inextricably intertwined' with the decision of the lower court to deny qualified immunity or when consideration of the additional issue is necessary to ensure meaningful review" (internal quotation marks and citation omitted)); *see also Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007); *Meals v. City of Memphis, Tenn.*, 493 F.3d 720, 727 (6th Cir. 2007); *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 795 n.5 (3d Cir. 2007); *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1198 (10th Cir. 2006); *Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005); *Wallace v. County of Comal*, 400 F.3d 284, 292 (5th Cir. 2005) (cautioning that the "exercise of this jurisdiction is only proper in rare and unique circumstances" (internal quotation marks and citation omitted)); *Kwai Fun Wong v. United States*, 373 F.3d 952, 960-61 (9th Cir. 2004); *Limone v. Condon*, 372 F.3d 39, 51 (1st Cir. 2004) (explaining that the doctrine must be used only "to ensure meaningful review of the linchpin issue"); *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000); *cf. Swint v. Chambers County Comm'n*, 514 U.S. 35, n.2 & 50-51 (1995) (discussing the scope of pendant appellate jurisdiction in the collateral order context).

In the district court's view, the statement in question was inadmissible hearsay. We respectfully cannot agree. The statement is offered to demonstrate the effect of this information on Officer Anders as he encountered Mr. Jewett and to explain the Officer's actions in detaining Mr. Jewett, *United States v. Norwood*, 798 F.2d 1094, 1097-98 (7th Cir. 1986); *United States v.*

(continued...)

Anders observed an individual peering out of the door
of the Wal-Mart where Thompson was thought to be. The
Officer then observed the individual, later identified as
Mr. Jewett, exit the Wal-Mart. Officer Anders drove toward
him in order to determine whether the individual en-
gaging in this suspicious behavior was Thompson. As
Officer Anders neared, Mr. Jewett fled without provoca-
tion and continued running despite Officer Anders' calls
for him to stop.[6] Once Mr. Jewett reached the door of the

---

[5] (...continued)
*1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir. 1985),
not to prove the truth of the matter asserted. All that matters
is that the statement was made and that Officer Anders heard it.

Mr. Jewett disputes the veracity of Officer Anders' assertion
that he had been given Thompson's height and weight. Specifi-
cally, Mr. Jewett maintains that Officer Anders inserted into his
police notebook Thompson's weight and height only after he
had detained Mr. Jewett. Given the posture of this case, we
may not rely on that portion of the statement. Mr. Jewett,
however, does not take issue with Officer Anders' assertion that
he had been told to proceed to the Wal-Mart to arrest Thomp-
son, a black male of approximately 22 years, the suspected
perpetrator of the previous days' attempted homicide. There-
fore, we consider only that portion of the statement in our
analysis.

[6] Mr. Jewett submits that Officer Anders' actions were unrea-
sonable because Mr. Jewett was not running away from the
police, but rather running back toward the Wal-Mart door
because he wanted to try to catch the door before it closed and
locked. Mr. Jewett claims that he had left his keys inside the
Wal-Mart and that he had run back to retrieve them. Mr. Jewett
also maintains that he did not see Officer Anders in the
marked police squad car or in his police uniform, and he did not
(continued...)

Wal-Mart, he began pounding frantically to gain entrance.
Upon reaching him, Officer Anders pushed him into the
door, brought him face down onto the floor and
handcuffed him. Given Officer Anders' reasonable belief
that Mr. Jewett was Thompson, who was wanted for
attempted murder and whom the police believed to be
armed, this procedure was "appropriate to accomplish
the purpose of [the] investigatory stop." *Weaver*, 8 F.3d at
1244 (alteration in original); *United States v. Dykes*, 406
F.3d 717, 720 (D.C. Cir. 2005) (holding that the police's
tackling of a suspect did not convert a *Terry* stop into an
arrest where the suspect was in flight, and the police
reasonably believed that he was armed); *Lawshea*, 461 F.3d
at 860-61 (holding that the use of a police dog to effectuate
a stop did not convert the detention into an arrest). It
allowed Officer Anders to frisk Mr. Jewett safely and to
confirm whether Mr. Jewett in fact was Thompson while
minimizing the danger to himself and to his partner. *See*
*Stewart*, 388 F.3d at 1085 (holding that it was not unreason-

---

[6] (...continued)
hear Officer Anders identify himself as a police officer. Never-
theless, Mr. Jewett's subjective motivations for running away are
irrelevant, as is the fact that he did not hear Officer Anders
identify himself as a police officer. When determining whether
a police officer has reasonable suspicion to conduct an inves-
tigatory stop, we "look to the officer['s] knowledge at the time
of the [detention], not the suspect's." *Marshall ex rel. Gossens*
*v. Teske*, 284 F.3d 765, 773 (7th Cir. 2002) (Manion, J., concurring)
(citing *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995)).
From Officer Anders' perspective, he observed suspicious
behavior and an individual matching Thompson's description
running away from him as he exited his marked police
squad car.

able for officers to handcuff an individual whom they believed had perpetrated a violent crime and whom they suspected was armed); *Tilmon*, 19 F.3d at 1228 ("When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons."). Given the totality of the circumstances, the force that Officer Anders used to effectuate the investigatory stop did not convert the encounter into a full arrest.[7] Moreover, because Officer Anders had reasonable suspicion to detain Mr. Jewett, we hold that his action "was justified at its inception." *Terry*, 392 U.S. at 20.

Once he had secured Mr. Jewett, Officer Anders frisked him, and, during the frisk, he retrieved Mr. Jewett's identification from his pocket, which identified him as Terrance Jewett rather than Andre Thompson. We have held that an officer may retrieve an individual's identification from his wallet. *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004) ("[A]n officer may check an individual's identification in his wallet during a *Terry* stop."); *Hernandez-Rivas*, 348 F.3d at 599. Officer Anders then placed Mr. Jewett in the squad car while he confirmed

---

[7] Officer Anders' motion for partial summary judgment did not request summary judgment on the merits or on qualified immunity grounds as to Mr. Jewett's excessive force claim. We acknowledge that our holding that Officer Anders' use of force in effectuating the investigatory stop did not convert the encounter into a formal arrest is in tension with Mr. Jewett's excessive force claim. The parties have not briefed this matter on appeal, and, more important, Mr. Jewett's excessive force claim is not before us.

his identification, issued him a municipal citation for obstructing a police officer and released him. *See Stewart*, 388 F.3d at 1084 (placing briefly an individual in a squad car does not convert a *Terry* stop into an arrest); *Tilmon*, 19 F.3d at 1228; *Vega*, 72 F.3d at 515.

The length of the detention is a factor in determining whether an investigatory stop was transformed into a formal arrest. Although Officer Anders claims that the entire incident—from the time that Mr. Jewett fled until the time that he was released—lasted twenty minutes, we are required, given the procedural posture of this case, to assume Mr. Jewett's version of thirty to forty minutes. The length of Mr. Jewett's detention alone did not convert the investigatory stop into an arrest.[8] Indeed, we have noted that "[t]here is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006). Furthermore, we have explained that "[w]hen delay is attributable to the evasive actions of a suspect, the police do not exceed the permissible duration of an investigatory stop." *Cady*, 467 F.3d at 1063. In this case, Mr. Jewett's evasive actions caused Officer Anders to chase, apprehend and frisk him and further caused Officer Anders to issue him a municipal citation, all of which contributed to the time that Mr. Jewett was detained. There

---

[8] *See, e.g., Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006) (twenty to thirty minutes); *Vega*, 72 F.3d at 515 (sixty-two minutes); *United States v. Davies*, 768 F.2d 893, 902 (7th Cir. 1985) (forty-five minutes); *see also, e.g., United States v. Gil*, 204 F.3d 1347, 1350-51 (11th Cir. 2006) (seventy-five minutes).

is no indication that Officer Anders detained Mr. Jewett longer than necessary to complete his investigation and issue the municipal citation.

Consequently, we conclude that Officer Anders' investigatory stop of Mr. Jewett was "reasonably related in scope to the circumstances which justified the interference in the first place."[9] *Terry*, 392 U.S. at 20.

## Conclusion

Accordingly, we hold that Mr. Jewett's detention fell within the bounds of a constitutional investigatory stop. We cannot say that Officer Anders acted unreasonably in detaining Mr. Jewett to determine his identity. Officer Anders therefore is entitled to qualified immunity as to

---

[9] Mr. Jewett's complaint also sought redress because Officer Anders "deprived him of liberty without due process of law." R.1 ¶ 44. Mr. Jewett's complaint does not explain whether the focus of his claim is a deprivation of procedural or substantive due process. The Supreme Court has cautioned that a substantive due process claim may not be maintained where a specific constitutional provision protects the right allegedly violated—in this case, the Fourth Amendment—and, therefore, we construe Mr. Jewett's claim as an alleged deprivation of procedural due process. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Graham v. Connor*, 490 U.S. 386, 394 (1989). Furthermore, because we have determined that Officer Anders' detention of Mr. Jewett was within the constitutional bounds set forth by *Terry*, his procedural due process claim cannot succeed. *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002) (explaining that a procedural due process claim requires a plaintiff to show that a state actor caused a deprivation of a constitutionally protected liberty interest).

Mr. Jewett's claims of unlawful arrest and deprivation of liberty. The judgment of the district court is reversed, and the case is remanded for further proceedings. Officer Anders may recover his costs of this appeal.

REVERSED and REMANDED

USCA-02-C-0072—4-11-08