In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1888

DANIEL MARTINEZ,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-00369 — **Robert M. Dow, Jr.**, *Judge.*

_____

ARGUED JUNE 1, 2018 — DECIDED AUGUST 17, 2018

_____

Before RIPPLE, KANNE, and BRENNAN, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 2012, Chicago Police Department officers arrested Daniel Martinez during a search of his home. They charged him with resisting arrest and obstruction of justice, but a jury acquitted him. He subsequently brought this action under 42 U.S.C. § 1983, alleging that the officers had violated the First and Fourth Amendments of the Constitution of the United States, as made applicable to the states by the Fourteenth Amendment, when they entered

and searched his home and seized him. He also alleged that the officers had committed the state tort of malicious prosecution. The jury found for the defendants on all claims. Mr. Martinez unsuccessfully sought judgment as a matter of law and a new trial. The district court entered judgment for the defendants, and Mr. Martinez now appeals. Because we believe that there was sufficient evidence to support the jury verdict and because Mr. Martinez failed to carry his burden of demonstrating the need for a new trial, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

On January 17, 2012, two police officers, Reynaldo Nunez and Joaquin Salazar, observed a white Ford Taurus, driven by Alberto Martinez ("Alberto"),[1] run a stop sign. The officers attempted to make a traffic stop, but Alberto abandoned his vehicle and fled on foot through an alley for two blocks. On the way, he discarded a .357 revolver. Officer Nunez pursued him on foot and radioed for backup, noting that the suspect was headed to "Talman and 55th."[2] He observed Alberto enter a building, and he radioed the address—"2622 in the building"[3]—before following him inside. Officer Nunez

---

[1] Because several individuals in this case have the same surname, we will employ their first names to facilitate identification.

[2] R.259-5 at 56.

[3] *Id.* at 59.

also described Alberto as a Hispanic male with a ponytail, who was wearing a gray shirt and blue jeans. Once Officer Nunez was inside the home, he saw Vanessa Martinez ("Vanessa"), Alberto's sister, seated on a couch. He asked where the man had run, and Vanessa pointed toward the back of the residence. Officer Nunez set out in that direction but did not find Alberto. Officer Nunez stated over the radio that the suspect likely had fled to the alley. He then began searching the home cautiously, looking for Alberto.

The building Alberto entered at 55th and Talman is, in fact, a duplex. It includes two separate residences: 2622 and 2624 West 55th. There is a single door on 55th Street; it is marked "2622."[4] The number 2624 also appears on the 55th Street side but in the corner, far from the door. There is a separate door on Talman, which appears to be marked 2624, although the photograph is not clear. Both residences were occupied by members of the Martinez family. The building has one garage and a single fence around a common back-yard, as well as a single architectural style and no obvious exterior indications that it contains two separate residences.

While Officer Nunez searched for Alberto, Officer Salazar recovered the weapon, secured the vehicle, and drove toward 55th and Talman. When Officer Salazar arrived at the house, he questioned Vanessa and learned that the suspect might be Alberto. Vanessa indicated that Alberto had long hair and drove a white Ford Taurus. Officer Salazar then transmitted the suspect's name, Alberto Martinez, over the radio. Because the building is across the street from an

---

[4] *See* R.289 (photographs).

elementary school and it was near dismissal time, the school was placed on lockdown.

Multiple police units responded to the radio transmissions. One of the arriving officers, Jeffrey Weber, entered the building through what he believed was a side door, but was actually the door to the separate residence, 2624 West 55th, facing Talman. He observed between ten and fifteen officers present.

Plaintiff Daniel Martinez ("Mr. Martinez") returned home from shopping with a friend, Alex Matias. Matias testified that they noticed the police cars and that Mr. Martinez left the car to investigate. He entered through the back of the building and went toward his room. Mr. Martinez claimed, to the contrary, that he was unaware of police officers at the residence. At some point, another officer announced over the radio that the suspect was returning, entering the home through the back door.

Mr. Martinez entered the living room and saw his niece on the couch with Officer Weber standing next to her. The curtains in the room were closed, making it somewhat dark, but the television was on, and Officer Weber was wearing his police uniform, including a coat with a police emblem. Mr. Martinez denied that he could tell that Officer Weber was in uniform, but his niece recognized the man as an officer. Officer Weber believed Mr. Martinez matched the description of the fleeing suspect, a Hispanic male with long hair pulled back. Mr. Martinez was, however, wearing a red shirt, not the gray shirt described in the radio transmissions. Officer Weber testified that he had not heard the shirt color over the radio. Mr. Martinez approached Officer Weber. He screamed expletives at the officer, demanded that he

"[g]et … out," and yelled "[w]e didn't call you."[5] Officer Weber asked his name, and Mr. Martinez responded that he was Daniel Martinez.

Officer Weber repeatedly ordered Mr. Martinez to the ground or to put his hands behind his back, and Mr. Martinez refused. Instead, at one point, Mr. Martinez walked toward the door and appeared to be attempting to open it. Officer Weber tried to detain Mr. Martinez so that Officer Nunez could come and make an identification, but Mr. Martinez pulled his arms away. Officer Weber called for assistance, and Officer Chavez came to the door. Officer Chavez's account confirmed that Mr. Martinez was flailing his arms to avoid Officer Weber. His testimony also confirmed that Mr. Martinez appeared to match the description of the suspect. Together, Officers Weber and Chavez took down Mr. Martinez and put him in handcuffs.

After Mr. Martinez was arrested, he saw Officer Allyson Bogdalek seated inside a police vehicle. According to Mr. Martinez's deposition testimony, he heard Officer Bogdalek say, "That's not him. That's Danny."[6] At trial, he added that he further heard her say, "Lock him up anyways."[7] Matias, the friend who had been shopping with Mr. Martinez, claimed that he heard Officer Bogdalek say, "Take him anyways. I don't care."[8] Outside of the house, Officer Nunez

---

[5] R.259-3 at 242.

[6] R.259-2 at 121.

[7] *Id.*

[8] *Id.* at 76.

identified Mr. Martinez as Danny, not Alberto. Officers Chavez and Weber nevertheless decided to arrest Danny for "resisting and obstructing."[9] Officer Chavez learned, once they were at the station, that Mr. Martinez had a pending civil rights action against Officers Weber and Bogdalek.[10]

Ultimately, Officers Chavez and Weber each filed two criminal complaints against Mr. Martinez, for resisting arrest and obstructing justice. With respect to resisting, both officers cited his pulling away from the officers when they attempted to put him in handcuffs. With respect to obstruction, both officers claimed that Mr. Martinez had attempted to block access to a room they wanted to enter to search for a fleeing suspect. The arrest report for the incident included a check-box for resisting that was marked "no." Officer Weber testified at Mr. Martinez's criminal trial on the resulting charges. In his testimony, he indicated that the language regarding blocking a room was in error, but that Mr. Martinez's conduct hindered the investigation of the original suspect because the officers were delayed in ascertaining his identity and in their continued search. Mr. Martinez was acquitted on all charges.

---

[9] *Id.* at 259.

[10] The other action, stemming from a 2008 incident, apparently ended in a settlement for the Martinez brothers. The district court in the present case granted a motion in limine by the defendants to bar any reference to the action other than the fact of its existence.

**B.**

Mr. Martinez brought this action against Officers Weber, Chavez, and Bogdalek, and their employer, the City of Chicago, in 2014. The case was tried to a jury, which returned a verdict for the defendants on all counts. Mr. Martinez moved for a judgment as a matter of law and for a new trial under Federal Rules of Civil Procedure 50(b) and 59, respectively.[11] The defendants moved for costs.

In a comprehensive order, the district court denied Mr. Martinez's motions and awarded $9,902.78 in costs to the defendants. With respect to his Rule 50 motion, the court concluded that evidence supported the jury's verdict on the unlawful entry and search claim because Alberto's flight had created an exigent need to enter the home and because the officers reasonably believed that the home was a single residence. On the unlawful seizure and false arrest claims, the court concluded that, although Mr. Martinez gave a different name and was wearing a different color shirt, other objective factors gave the officers reason to believe he was the fleeing suspect, including that he came into the house, was a Hispanic male with long hair pulled back, had the same last name as the suspect and was found close to the place where

---

[11] Mr. Martinez presented to the jury claims rooted in the constitutionality of the search and seizure under the Fourth and Fourteenth Amendments, as well as state law claims for malicious prosecution. In addition, he alleged a conspiracy by the officers to violate his constitutional rights and a claim for retaliation for his prior civil rights lawsuit, in violation of the First and Fourteenth Amendments. The conspiracy and retaliation claims were not part of his Rule 50 or Rule 59 motions and are not before us in this appeal.

Alberto had last been seen. This evidence was sufficient to permit the jury to conclude that the officers had probable cause to believe that Mr. Martinez was a fleeing suspect. The court also determined that there was sufficient evidence to arrest Mr. Martinez for resisting and obstructing. Finally, on his claim for malicious prosecution, the court agreed with the defendants that errors in the charges were negligent but did not show malice.

The district court then ruled on Mr. Martinez's Rule 59 motion. The court noted that the jury had to sort out "testimony that was riddled with inconsistencies" and had reached a reasonable conclusion in light of the evidence.[12] The court also rejected Mr. Martinez's claim that the defendants' closing statement, which referenced a gunman in the proximity of a school, was unfairly prejudicial. Specifically, the court rejected the challenge as waived because Mr. Martinez had not objected to such a reference at trial. The court further rejected challenges to several jury instructions as well as his argument that our cases have allocated wrongly the burden of proof in warrantless Fourth Amendment cases. Finally, the court rejected a series of challenges to evidentiary rulings as lacking in merit.

## II

## DISCUSSION

In this appeal, Mr. Martinez now asks us to review the district court's rulings on his post-trial motions. In his view,

---

[12] R.279 at 25.

the record contains no legitimate justification for the warrantless entry into his home. He also maintains that his subsequent detention and arrest were not supported by probable cause. Finally, he submits that we should revisit our holding in *Bogan v. City of Chicago*, 644 F.3d 563 (7th Cir. 2011), and reallocate the burden of proof in warrantless Fourth Amendment cases.

Under Rule 50, a court may enter judgment as a matter of law when it "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to support its verdict. Fed. R. Civ. P. 50(a)(1); *see also id.* 50(b). We review the court's denial of a Rule 50(b) motion de novo. *Venson v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014). "Our task is to consider whether the evidence, viewed in the light most favorable to the defendants, is sufficient to support the verdict in their favor." *Id.* We must "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Only if no rational jury could have found for the defendants will we reverse." *Venson*, 749 F.3d at 646.

Under Rule 59, a district court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). We have stated that "[a] new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson*, 749 F.3d at 656. "[B]ecause that decision is committed to the district court's discretion, we will not disturb it except under exceptional circumstances showing a

clear abuse of discretion." *LaFollette v. Savage*, 63 F.3d 540, 544 (7th Cir. 1995) (internal quotation marks omitted).

## A.

We begin with Mr. Martinez's claim that the district court erroneously concluded that Officer Weber's initial decision to enter and search his home was constitutional.

The Supreme Court has long held that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* One such exception is when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (internal quotation marks omitted).[13] Among the exigencies recognized as justification for a warrantless entry into a residence is engaging in "hot pursuit" of a fleeing suspect. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). Other relevant exigencies include "when there is a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at

---

[13] *See also Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011) ("The exigent circumstances doctrine recognizes that there may be situations in which law enforcement officials may be presented with a compelling need to conduct a search, but have no time to secure a warrant." (internal quotation marks omitted)).

the police or other persons," or when "there is a risk that the suspect may escape." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014).

Whether exigent circumstances existed is a mixed question of fact and law that we review de novo. *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012). In determining whether an exigency permitted law enforcement to enter without a warrant, we conduct an "objective review" and "ask whether a reasonable officer had a reasonable belief that there was a compelling need to act and no time to obtain a warrant." *Bogan*, 644 F.3d at 572 (internal quotation marks omitted). We consider "the totality of facts and circumstances as they would have appeared to a reasonable person *in the position of the … officer*—seeing what he saw, hearing what he heard." *Id.* at 571–72 (alteration in original) (emphasis in original) (internal quotation marks omitted).

The objective facts known to Officer Weber clearly support the existence of exigent circumstances. Officer Weber testified that he heard at least portions of numerous radio transmissions about a suspect, who, upon being pulled over for a traffic violation, had run from officers and discarded a weapon. The officer heard a transmission that the suspect had entered the residence on 55th and Talman. When he arrived on the scene, a search was in progress. Many officers were present, securing the perimeter and searching the premises. He entered the building through an open door on Talman and saw other officers already present. As it turns out, the door on Talman opened to one-half of the duplex, and not the half through which Alberto was believed to have

run; its status as a separate residence, however, was not obvious, as Mr. Martinez now concedes.[14] A reasonable person in the position of Officer Weber, therefore, would not have known that he was entering a separate home.[15] The radio transmissions indicated a fluid situation where there remained the possibility that the suspect was in the immediate area. At no point did any transmission indicate that the suspect had been apprehended or definitively had left the property. These facts objectively support the exigency created by Alberto's flight into the home and suggest that it had not dissipated.

Mr. Martinez's assertions essentially amount to attacks on the credibility of the law enforcement witnesses.[16] "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are within the province of the jury," *Bogan*, 644 F.3d at 572 (internal quotation marks omitted). Furthermore, the issue of Officer Weber's credibility on what he encountered when he arrived on the scene and what he knew about the suspect and the building, were all questions squarely put before the jury by Mr. Martinez's counsel.

---

[14] Appellant's Br. 20.

[15] For the same reasons, Mr. Martinez's claim that the jury should not have been instructed on mistake is not persuasive. At trial, Mr. Martinez himself repeatedly drew the jury's attention to the fact of the separate residences, arguing in part that it was unreasonable for the officers to assume Alberto had ever been in 2624; resolving the legal status of a mistake was relevant to the jury's understanding of the case.

[16] *See, e.g.*, Appellant's Br. 19 (asserting that Officer Weber "concocted a sham").

**B.**

The district court imposed the burden of persuasion with respect to all elements of the Fourth Amendment claim on Mr. Martinez, including that the police were not justified in their entry by any exigency recognized at law. In doing so, the district court properly applied the rule of *Bogan* v. *City of Chicago*, 644 F.3d 563 (7th Cir. 2011). Mr. Martinez acknowledges that *Bogan* is the law of this circuit, but urges this court to revisit its holding, at least in cases such as this one where the plaintiff alleges police misconduct. We decline that invitation. We note, as we did in *Bogan*, that the approach we chose is consistent with our approach to § 1983 claims alleging other types of Fourth Amendment claims. *See Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997) (holding that the burden to establish the lack of consent to search fell on the plaintiff, once asserted by the defendant); *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009) (per curiam) ("[A] plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause."). The district court committed no error in following the law of this circuit regarding the allocation of burdens of proof.

**C.**

Mr. Martinez disputes whether Officer Weber had the authority first to conduct an investigatory stop and then arrest him. He contends that the district court erroneously concluded that there was probable cause to believe that he was the fleeing suspect.

As Mr. Martinez's brief concedes, Officer Weber's initial encounter with Mr. Martinez was an investigatory stop, not an arrest. Officer Weber merely asked Mr. Martinez's name and sought to keep him in the home so that other officers could come in and make a definitive identification. As such, it was not necessary that Officer Weber's initial seizure of Mr. Martinez be supported by probable cause, but only reasonable suspicion. *See generally Terry v. Ohio*, 392 U.S. 1 (1968); *Jewett v. Anders*, 521 F.3d 818, 823–24 (7th Cir. 2008).

When reviewing the reasonableness of a *Terry* stop, we evaluate the totality of the circumstances. *Jewett*, 521 F.3d at 824. Officer Weber testified that he knew, from the radio transmission, that he was looking for a suspect with the last name "Martinez." He also knew that the suspect was a Hispanic male with long hair pulled back into a pony tail,[17] who had headed into the home in which Officer Weber encountered Daniel Martinez. Mr. Martinez reacted aggressively to Officer Weber's presence, shouting expletives at him, telling him to leave, and screaming that they had not called the police. Although the limited physical description of the suspect would, *without context*, be insufficient justification for a stop, *see Reid v. Georgia*, 448 U.S. 438, 441 (1980) (rejecting a justification that would "describe a very large category of presumably innocent" persons), the temporal and geographic proximity to the last sighting of the suspect is entitled to some weight in the analysis, *see D.Z. v. Buell*, 796 F.3d 749,

---

[17] There is a great deal of dispute in the transcript about whether the description of long hair pulled back into a pony tail sufficiently matched the description of Mr. Martinez, who Officer Weber described as wearing his long hair in a messy bun. The jury's verdict resolves this question.

754 (7th Cir. 2015) (concluding that reasonable suspicion supported the stop when the individual "somewhat matched" the description given over the police radio, when paired with the "temporal and geographic proximity of the stop to the reported crime, and the behavior of the suspect"); *see also Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001) (noting that the police had probable cause, because, although the arrestee "did not match exactly the characteristics provided by the two women, he bore a fair resemblance").[18] Considering all the circumstances, Of-

---

[18] In *United States v. McCauley*, 659 F.3d 645, 649–51 (7th Cir. 2011), we considered at some length whether a limited description of a suspect could support the even higher burden of probable cause applicable to warrantless arrests, rather than *Terry* stops. There, the suspect was identified only as between "5-feet and 5-feet-4-inches, with a medium build of around 125 pounds, and braided, collar-length hair." *Id.* at 647. On appeal, the criminal defendant asserted that if such a description supported probable cause, it would subject all short black males in the vicinity to arrest. We disagreed. We distinguished between cases involving a limited description and a public area, such as a bar, from those involving a more specific or closed location, such as the defendant's home. We also noted that the Supreme Court had found probable cause to arrest a man located in a suspect's home who provided identification showing he was not the suspect, but who fit the general description of the suspect. *Hill v. California*, 401 U.S. 797, 803 (1971) ("Upon gaining entry to the apartment, they were confronted with one who fit the description of Hill received from various sources. That person claimed he was Miller, not Hill. But aliases and false identifications are not uncommon."); *see also id.* at 802 ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (quoting *People v. Hill*, 446 P.2d 521, 523 (Cal. 1968)).

ficer Weber's brief investigatory detention of Mr. Martinez does not offend the Fourth Amendment.

Mr. Martinez objected to his detention vociferously. Indeed, he shouted profanities. Encountering this lack of cooperation, and considering the exigency underway, Officer Weber repeatedly ordered Mr. Martinez to the ground. Mr. Martinez not only failed to comply with the order, at one point, Mr. Martinez walked toward the door and appeared to be attempting to open it. When Officer Weber attempted to physically restrain Mr. Martinez so that Officer Nunez could come and make an identification, Mr. Martinez pulled his arms away. Officer Chavez's testimony is further evidence that Officer Weber struggled with Mr. Martinez, who was flailing his arms to avoid Officer Weber. The officers together took down Mr. Martinez, put him in handcuffs, and placed him under arrest for resisting arrest and obstruction.

Mr. Martinez's actions provided the officers with probable cause to arrest him. Under Illinois law, it is an offense to "resist[] or obstruct[] the performance by one known to the person to be a peace officer … of any authorized act." 720 ILCS 5/31-1(a). The statute prohibits two kinds of interference with police activities, and Mr. Martinez was charged with both.

The first charge, resistance, has been examined thoroughly in the Illinois cases since *People v. Raby*, 240 N.E.2d 595 (Ill. 1968). The Illinois courts have held that it does "not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe[s] only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent[,] or delay the performance of the

officer's duties, such as going limp, forcefully resisting arrest[,] or physically aiding a third party to avoid arrest." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 721 (7th Cir. 2013) (alterations in original) (quoting *Raby*, 240 N.E.2d at 599). We have stated that the standard "has often proved difficult in application," but that "the most straightforward cases … are those in which a person physically scuffles with a police officer performing his or her official duties or attempts to elude the police," and "[a]t the other end of the spectrum … are those involving only verbal argument." *Id.* at 722.

We have little difficulty in concluding that Mr. Martinez's conduct falls in line with the more straightforward of the Illinois cases. During his brief confrontation, he refused to comply with orders, was verbally aggressive, appeared to walk toward the door, and repeatedly pulled away from the officers.[19] The officers therefore had probable cause to arrest him for the offense of resisting on the basis of his conduct during this brief encounter.

---

[19] Mr. Martinez repeats an argument he made to the district court that he was entitled to resist arrest based on *People v. Young*, 241 N.E.2d 587 (Ill. App. Ct. 1968). As the district court pointed out, *Young* is a case about resistance to search, not seizure, and the Illinois statutes are clear that forceful resistance to arrest is not permitted even when the arrestee "believes the arrest is unlawful and the arrest in fact is unlawful." 720 ILCS 5/7-7.

Mr. Martinez also argues that any probable cause disappeared when Officer Nunez told the others he was not the fleeing suspect, but this identification is irrelevant to whether his conduct during the arrest itself supported the officers' decision not to release him.

In contrast to the offense of *resisting* as interpreted by *Raby*, the other form of official interference prohibited by 720 ILCS 5/31-1(a), obstruction, does not turn on the performance of a physical act; instead, it is focused on the *consequence* of the interference. As the Illinois Supreme Court recently explained, "'resist' implies some type of physical exertion in relation to the officer's actions. It would be superfluous for the legislature to then limit 'obstruct' to the same meaning." *People v. Baskerville*, 963 N.E.2d 898, 905–06 (Ill. 2012). Accordingly, "[a]lthough a person may commit obstruction of a peace officer by means of a physical act, this type of conduct is neither an essential element of nor the exclusive means of committing an obstruction. The legislative focus of section 31-1(a) is on the tendency of the conduct to interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties." *Id.* at 905. Not only did Mr. Martinez disobey the officer's commands, *People v. Smith*, 77 N.E.3d 87, 92 (Ill. App. Ct. 2013) (disobedience of an officer's command can be included in the definition of obstruction); *People v. Gordon*, 948 N.E.2d 282, 287–88 (Ill. App. Ct. 2011) (failure to leave the scene of a traffic stop after being repeatedly ordered to leave constituted obstruction), but dealing with Mr. Martinez pulled both officers away from the most significant task at hand: locating the fleeing suspect and securing the area, *cf. Gordon*, 948 N.E.2d at 287–88 (affirming conviction where defendant refused police order and yelled profanities and threats at officers while a companion tried to escape). The police therefore had probable cause to arrest Mr. Martinez on the separate offense of obstructing.

**D.**

Finally, Mr. Martinez argues that the district court should have granted his post-trial motions regarding his claim for malicious prosecution. However, our conclusion that the officers had probable cause to arrest Mr. Martinez on charges of both resisting and obstructing resolves this claim as well. "To state a claim for malicious prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Sneed v. Rybicki*, 146 F.3d 478, 480–81 (7th Cir. 1998) (internal quotation marks omitted). The existence of probable cause for each offense charged is a complete defense to an action for malicious prosecution. *Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. App. Ct. 2007).[20]

**Conclusion**

Mr. Martinez tried his claims before the jury, which resolved the significant factual disputes between his account and that of the officers against him. Mr. Martinez has not carried the heavy burden to establish entitlement to a new trial or to judgment as a matter of law, and the district court

---

[20] Because we believe that the arrest and the prosecution were supported by probable cause, we need not consider Mr. Martinez's argument that the evidence demonstrated malice by the officers. In any event, the issue of officer credibility was aggressively pursued by Mr. Martinez at trial, and the jury found in the officers' favor.

therefore committed no error in denying his post-trial motions. The judgment of the district court is affirmed.

AFFIRMED