In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 18-1498, 18-1499, 18-2170, & 18-2177

J.K.J. and M.J.J.,

*Plaintiffs-Appellees*,

*v.*

POLK COUNTY and
DARRYL L. CHRISTENSEN,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 15-cv-428-wmc and 15-cv-433-wmc — **William M. Conley**, *Judge*.

ARGUED NOVEMBER 9, 2018 — DECIDED JUNE 26, 2019

Before BAUER, BRENNAN, and SCUDDER, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Darryl Christensen, a Polk County, Wisconsin Jail corrections officer, sexually assaulted plaintiffs J.K.J. and M.J.J. over three years during their incarcerations. Plaintiffs sued Christensen and the county under 42 U.S.C. § 1983, alleging Eighth and Fourteenth Amendment claims, in addition to a state law negligence claim against the county. After trial, the jury found Christensen and the county

liable for J.K.J. and M.J.J.'s injuries and awarded each $2 million in compensatory damages. The jury also levied punitive damages against Christensen, awarding $3,750,000 to each plaintiff. Both defendants moved for new trials, and the county also moved for judgment as a matter of law. The district court denied those requests and defendants now appeal the judgments entered against them.

We see no reason to disturb the jury's verdict against Christensen and so affirm the denial of his request for a new trial. His assaults were predatory and knowingly criminal. But to impose liability against the county for Christensen's crimes, there must be evidence of an offending county policy, culpability, and causation. These are demanding standards. Christensen's acts were reprehensible, but the evidence shows no connection between the assaults and any county policy. We therefore reverse and remand for entry of judgment in favor of the county.

## I. BACKGROUND

### A. Christensen's Sexual Assaults

M.J.J. and J.K.J. were inmates at Polk County Jail at various times between 2011 and 2014. Christensen admits he engaged in sexual acts with the women individually. To hide his offenses, Christensen planned his encounters to occur when no one was present and in locations where he controlled access. He also urged plaintiffs not to discuss or report his sexual advances because he would lose his job and family if caught. Plaintiffs complied with Christensen's secrecy directive and his assaults were kept hidden from jail officials.

Polk County authorities discovered Christensen's assaults against M.J.J. and J.K.J. after a former inmate reported her

own sexual encounters with Christensen to an investigator in a neighboring county. When notified of the former inmate's allegations, county authorities initiated an internal investigation and confronted Christensen, who immediately resigned. The investigation continued, which led to the discovery of Christensen's abuse of plaintiffs, and ultimately to his prosecution. He eventually pleaded guilty to several counts of sexual assault and is serving a 30-year prison sentence.

### B. Trial Evidence

Plaintiffs sued the county and Christensen in separate actions and the cases were consolidated for jury trial. Plaintiffs alleged that defendants were deliberately indifferent to a serious risk of sexual assault in violation of their Eighth and Fourteenth Amendment rights, and that the county violated state law by negligently supervising Christensen.

At trial, Christensen admitted his offenses but challenged the harms plaintiffs suffered. He argued plaintiffs consented to his overtures and that their encounters were the product of "voluntary attraction." Although not stated directly, his position implied that any award of damages should correspond to plaintiffs' level of consent. Plaintiffs denied consenting to Christensen's advances and offered expert testimony showing their mental trauma from his assaults.

Against the county, plaintiffs made four principal allegations: (1) the jail's sexual assault policies and training were inadequate; (2) the jail customarily tolerated sexually offensive comments by guards; (3) the investigation of a former guard revealed the jail's sexual assault policy was inadequate and that the jail minimized sexual abuse; and (4) the jail failed to widely implement recommendations under the Prison Rape

Elimination Act (PREA), 34 U.S.C. §§ 30301–09. The sum of these allegations, plaintiffs argued, prove the county was deliberately indifferent to a known risk of sexual assault by jail staff. The county disagreed, arguing that the trial evidence did not support the jury's liability finding and damages awards. These claims were heavily contested, and we recount the evidence noting those facts the county disputed. Although we summarize the trial evidence, on appeal we view the facts in the light most favorable to the jury's verdict. *See Lindsey v. Macias*, 907 F.3d 517, 518 n.1 (7th Cir. 2018).

### 1. Policies and training

Plaintiffs alleged the jail had no policy either to prevent or detect sexual assaults, and that its policies on sexual misconduct were "practically nonexistent." At trial, the county produced several policies prohibiting sexual contact between guards and inmates, and two stand out.

Policy I-100 forbids any mistreatment or harassment of inmates, explaining inmates' rights and informing them that it is never acceptable for "any inmate [to] be the object of verbal, physical, emotional, psychological, or sexual harassment by facility staff." The policy continues, "[a]ny officer engaged in such actions is subject to disciplinary charges and/or termination." Inmates are also provided a handbook when booked into the jail that says:

> Every inmate has the right to be safe from sexual abuse and harassment. No one has the right to pressure you to engage in sexual acts. If you are being pressured threatened, or extorted for sex, you should report this to staff immediately.

Likewise, Policy C-202 prohibits any "intimate social or physical relationship with a prisoner." It also informs jail staff that sexual contact with any inmate is a criminal offense under Wisconsin law, and any officer that suspects such conduct has a duty to report it. *See* Wis. Stat. § 940.225(2)(h) (categorizing sexual contact and sexual intercourse by a correctional staff member with an inmate as a Class C felony).

Plaintiffs also claimed the county never trained officers to avoid sexual assaults. But the jail's onboarding and continuing education programs instruct employees that sexual contact with prisoners is a crime and never permitted. The Wisconsin Department of Corrections (DOC) approved these programs annually, requiring: (1) eight to ten weeks of "field training," during which a new corrections officer shadows an experienced officer to learn jail policies and procedures; (2) completion of a 160-hour jail training program to become a certified corrections officer; (3) 24 hours of continuing education each year to be recertified; and (4) daily training, which includes specific training on the jail's prohibition against fraternizing with inmates.

At trial, Christensen acknowledged the jail trained him that sexual contact with inmates is a felony and against jail policies. Specifically, Christensen testified:

- He knew his conduct violated jail policy;
- He was trained his conduct was a crime;
- He knew he was putting plaintiffs at risk;
- He never forgot that sex with inmates was a crime; and
- He agreed he did not require more training to know his conduct was a crime.

Plaintiffs' expert witness on prison training standards, Jeffrey Eiser, testified that the jail's policies prohibited sexual contact between inmates and guards. Eiser also corroborated that the county trained Christensen that sexual contact with inmates was a felony and against jail policy.

To support their contention that the jail never trained its staff, plaintiffs relied on two witnesses. The first, Lynelle Manning, was a jailer with the county for about 20 months. Manning testified that although she was never officially certified as a correctional officer, she received "formal training" by the jail and shadowed a senior officer for weeks. She also received and read the jail's policy and inmate booking manuals, which contain the jail's prohibition of sexual contact between guards and inmates. Manning also testified that during her employment she never heard sexually charged conversations between jail staff and inmates.

Plaintiffs' second witness, Sergeant Steven Schaefer of the county's sheriff's department, worked at the jail from 2002 until 2015. Schaefer testified "we were all required to attend" countywide training on sexual harassment. He provided the training to new employees from time to time. According to Schaefer, that training instructed on the jail's numerous prohibitions between staff and inmates, including improper comments, becoming too close or too familiar, sharing personal information, and sexual relationships. He also agreed that improper relationships between inmates and guards were "something that the jail as a whole took very seriously." Notwithstanding Schaefer's testimony, plaintiffs' counsel told the jury during closing argument: "You heard Sergeant Schaefer say, 'We never trained on it. We never trained on it. We never trained on it.'"

### 2. *Inappropriate speech*

Next, plaintiffs alleged that jail staff routinely made sexually inappropriate comments about female inmates without repercussions.

According to plaintiffs, Captain Scott Nargis, who oversaw daily operations of the jail, was the reason that sexually offensive speech was accepted at the jail. During adverse examination, plaintiffs' counsel asked Nargis if he ever "engaged in tier talk which is not necessarily flattering talk amongst co-workers"; Nargis answered "yes." Nargis also agreed that he participated in tier talk "on occasion" to establish trust among subordinate officers. Plaintiffs never asked Nargis on the witness stand if he himself made sexual comments. Nor did plaintiffs present evidence that tier talk connoted "sexual talk," that Nargis's "tier talk" was sexually explicit, or that Nargis made comments sexual in nature with, about, or around inmates or guards.

Evidence to suggest Nargis knew about offensive comments by jail staff was scarce and unclear as to timing. Nargis testified that during Christensen's twelve-year employment, he once heard Christensen comment on a female's "rear end." He did not recall whether that comment was made about an inmate. Nargis also recalled being told that Christensen once remarked about an inmate's breasts.

Evidence of inappropriate sexual comments by other jail staff was also sparse and unspecific. J.K.J. testified she believed two other corrections officers once overheard Christensen making flirtatious comments to inmates. Christensen also

testified to overhearing a jail guard, Allen Jorgenson, and two other guards make suggestive comments to inmates. But J.K.J. and Christensen offered no specifics on the alleged comments, and there was no evidence these incidents were reported to the county or any jail supervisor.

### 3. *Investigation of former guard*

At trial, plaintiffs introduced one other allegation of sexual contact between a jail guard, Jorgenson, and an inmate, N.S.: another inmate saw Jorgeson put his arm around N.S.'s waist and "pat her on the butt." This occurred in 2012, two years before the discovery of Christensen's violations.[1] Sergeant Steven Schaefer reported these allegations to Nargis, who in turn questioned Jorgenson and N.S. individually. Each denied any improper relationship or contact. Despite these denials, Nargis requested the assistance of chief deputy sheriff Steven Moe to further investigate Jorgenson.

To plaintiffs, the Jorgenson investigation proves the county "minimized" and ignored allegations of a guard assaulting an inmate. At trial, the jury considered the findings of the Jorgenson investigation, including Jorgenson's interactions with N.S. Another inmate believed Jorgenson and N.S. had an "inappropriate relationship" but "no physical relationship." It was also reported that Jorgenson misused a jail camera to focus on inmates longer than necessary. In addition to an internal investigation, Nargis and Moe reached out to former inmates as part of their review. Because of inconsistent

---

[1] Although Christensen's assaults began in 2011, the county first learned of his assaults on October 29, 2014.

witness accounts, Nargis and Moe could not confirm that Jorgenson engaged in any sexual contact with N.S. Still, Nargis and Moe concluded that Jorgenson's affiliation with N.S. violated jail policy. As a result, Jorgenson was issued a written reprimand for "foster[ing] a friendship relationship" by giving "undue, unfair, or simply too much attention" to N.S., who continued to deny any improper actions or relationship up to the point of Jorgenson's reprimand.

After Jorgenson was written up, N.S. recanted her denials in a letter to Nargis. In response, Nargis and Moe reopened the investigation "to take a whole fresh look at the situation." N.S.'s letter detailed that Jorgensen made sexually harassing gestures and crude and indecent remarks, and asserted allegations of Jorgeson putting his arm around N.S.'s waist and touching her "back and butt." After this second review, Nargis and Moe could not confirm these allegations and decided the reprimand remained the appropriate level of discipline. At trial, no evidence was submitted that Nargis or Moe erred in the Jorgenson investigation or performed their inquiries in bad faith. In closing, plaintiffs' counsel argued to the jury that the "jail knew that one of their trusted friends was committing sexual assault against at least one inmate, N.S." but considered it "no big deal."

Jorgenson also made inappropriate remarks, of which inmates and staff were aware. But there was no evidence Jorgenson's improper comments were reported to Nargis, Moe, or any county policymaker before the N.S. investigations. On that point, the county argued the N.S. allegations prompted complaints by various female coworkers, who

claimed Jorgenson made inappropriate comments to them as well. Those coworker complaints led to a human resources investigation that resulted in Jorgenson resigning.

### 4. *Prison Rape Elimination Act (PREA)*

The county's sexual assault policies were inadequate to prevent and detect assaults, and the county deliberately avoided opportunities to reduce sexual assault risks, according to plaintiffs. Both arguments were based on the county's purported underutilization of policy recommendations from PREA.

Again, plaintiffs zeroed in on Nargis. They claimed the jail intentionally shunned PREA because Nargis openly "denigrated … PREA standards," citing a 2014 email from Nargis to jail staff about PREA training:

> Seems to be that everyone is in a tizzy to train their staff on PREA. There is no requirement for use [sic] to be compliant with everything that the law calls for, but nevertheless it is federal law. So we'll hit the basics of PREA training.

At trial, plaintiffs termed this "the tizzy email." To plaintiffs, Nargis's choice of the word "tizzy" was "mocking" PREA and "indicat[ed] that he disliked PREA." They also claimed the email never discussed any specific PREA measures. Rather, it merely restated the jail's current anti-sexual assault policies. Plaintiffs argued "the tizzy email" proves that Nargis and the jail "consciously disregarded" PREA standards, and by extension, disregarded the risk of sexual assaults at the jail.

Plaintiffs' expert Eiser opined that the jail's sexual assault policies and training were inadequate because they did not fully adopt certain components of PREA. Eiser conceded compliance with PREA is not mandatory for county jails in Wisconsin, and that PREA standards are better viewed as optional "best practices." Eiser also testified there is no empirical data that compliance with the proposed best practices would yield a better result. Plaintiffs agree that state law, not PREA, governs county jails in Wisconsin, but did not offer evidence that the jail's sexual assault policies or training fell below state legal or administrative standards.

As for compliance with state law, the county argued the DOC annually reviews the jail's policies, including its policy prohibiting fraternization with inmates. In each year of plaintiffs' incarcerations, the DOC found the jail to be in full compliance with all applicable Wisconsin statutes and regulations. Language addressing PREA was added to the jail's anti-fraternization policy in 2012, with an accompanying PREA training in 2014. The county also noted that in the past nine years, during which the jail housed 14,100 inmates, Jorgenson's circumstance was the only known improper relationship between a guard and an inmate.

## C. Verdict and Post-Verdict Motions

The district court bifurcated the trial into liability and damages phases. At the close of the liability phase, during the jury instruction conference, the court found the evidence failed to show a pattern of constitutional violations known to county policymakers. As a result, the court excluded this basis

of liability from the jury instructions, leaving plaintiffs to argue that the "risk of the inadequacy of the training, supervision, and/or adoption of policies [was] plainly obvious." The court also rejected a jury instruction as to whether plaintiffs consented to Christensen's sexual contact and thus reduced plaintiffs' harm.

After a five-day trial, the jury found for plaintiffs on all claims and awarded each plaintiff $2 million in compensatory damages against the county and Christensen. The jury also awarded $3,750,000 to each plaintiff in punitive damages against Christensen.

After the verdict, Christensen moved for a new trial under FED. R. CIV. P. 59. Christensen argued there was insufficient proof that he harmed plaintiffs or was aware of the substantial risk of harm his actions imposed. The district court rejected these arguments, relying on plaintiffs' testimony that they never consented to Christensen's advances.

The county also moved for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59. This resulted in partial yet hollow success for the county—the district court granted judgment to the county on plaintiffs' state law negligence claims, but denied the county judgment on plaintiffs' § 1983 claims, as well as a new trial.

The district court rejected the county's contention that plaintiffs failed to prove it was culpable for and the cause of Christensen's violations, as required for liability under *Monell v. New York City Dep't of Soc. Servs*, 436 U.S. 658 (1978). Although the court noted the evidence against the county was "not overwhelming," it concluded three subjects supported

the verdict: (1) jail supervisor Nargis "generally acknowl-
edged his awareness of tier talk" at the jail; (2) Nargis was
aware of sexual comments by correctional officers to inmates
and female employees through the Jorgenson investigation,
in addition to two comments made by Christensen; and (3)
the county held only one PREA training session. For the dis-
trict court, this was sufficient evidence for the jury to find
"that Nargis and others within the [county] … acted with
deliberate indifference to the need for better training, super-
vision and policies." So the verdict against the county re-
mained intact.[2]

## II. DISCUSSION

The county and Christensen both argue the district court
improperly denied them judgment as a matter of law or a new
trial under Rules 50 and 59. At the outset, we note Christensen
never filed a post-verdict motion for judgment as a matter of
law under Rule 50. Without such a motion, he forfeited his
request for judgment under that rule, and our review is lim-
ited to his request for a new trial under Rule 59. *See Unitherm
Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01, 404–
05 (2006); *accord Collins v. Lochard*, 792 F.3d 828, 831 (7th Cir.
2015).

A district court may enter judgment as a matter of law un-
der Rule 50 when it "finds that a reasonable jury would not

---

[2] On plaintiffs' state law claims of negligent training and supervision,
the district court concluded the county was entitled to immunity under
WIS. STAT. § 893.80(4). Opinion and Order at 3–6, *J.K.J. v. Polk Cty.*, No.
15-CV-428 (W.D. Wis. Feb. 5, 2018), ECF No. 279. Plaintiffs do not appeal
this decision, nor do they appeal the district court's liability phase ruling
that plaintiffs failed to offer proof of a pattern of prior constitutional vio-
lations known to policymakers.

have a legally sufficient evidentiary basis" to support its verdict. FED. R .CIV. P. 50(a)(1); *see also* Rule 50(b). We review the denial of a Rule 50 motion de novo and proceed "on the basis of the evidence the jury actually had before it." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (internal citation omitted) (denying *Monell* claim). We will overturn a jury verdict if it is clear plaintiffs failed to present enough evidence to support their claims. *Id*. (citing *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004)). "Our job is to assure that the jury had a legally sufficient evidentiary basis for its verdict." *Filipovich*, 391 F.3d at 863.

Under Rule 59, a district court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party. *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (citation and quotation marks omitted). We will not disturb a district court's Rule 59 decision except under exceptional circumstances showing a clear abuse of discretion. *Id*.

First, we consider whether the district court improperly refused to grant the county's motion for judgment as a matter of law. Later, we turn to Christensen's claim that he is entitled to a new trial.

### A.  The County

The county argues *Monell* precludes the jury's finding of § 1983 liability against it. Under *Monell*, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton*,

*Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts." (emphasis in original)). Thus, a municipality cannot be held liable under § 1983 solely because one of its agents or employees may have violated an individual's constitutional right. *Monell*, 436 U.S. at 691, 694 (rejecting § 1983 liability predicated on theory of *respondeat superior*). Instead, a municipality's own policy or custom must have caused the constitutional violation. *Id.*; *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The central question is always whether an official policy … caused the constitutional violation.").

To establish municipal liability under *Monell*, a plaintiff must prove three things. First is the existence of an unconstitutional policy. This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking authority. *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Second is that the municipality is culpable, which means the municipality's policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations. *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407, 410 (1997) (citing *Canton*, 489 U.S. at 388). Third, the municipality's policy must "directly cause[] a deprivation of federal rights." *Id.* at 415. In other words, the county's own actions must be the "moving force" behind plaintiff's injuries. *Id.* at 404.

An unconstitutional policy can include implicit policies, or a gap in expressed policies. *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (citations omitted). Either way, plaintiffs must prove an actual policy is at issue, not a random event. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Here, plaintiffs alternate between arguing Christensen's violations were the byproduct of an implicit policy, reflected in the jail's alleged widespread practice and custom of "allow[ing] and encourag[ing] inappropriate sexual behavior," and purported gaps in the county's express sexual assault policies, reflected in the absence of PREA measures.[3]

At trial, plaintiffs advanced a number of theories of the county's liability under *Monell*. We start with plaintiffs' claim that the county was deliberately indifferent to a known and obvious risk that its express policies would lead to, and in fact caused, Christensen's assaults. Then, we consider whether plaintiffs' general allegations against the county amount to an implicit policy, i.e., a widespread practice or custom, that permits sexual misconduct by jail staff; and if so, whether the county's deliberate indifference to that policy caused Christensen's assaults. Next, we examine plaintiffs' contention that the county was deliberately indifferent to the need for more training and supervision, causing plaintiffs' injuries.

---

[3] The district court concluded Nargis was a policymaking official. The county challenges this finding. An "official policy" is the predicate for municipal liability under *Monell*. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). But even if Nargis's acts are said to represent the county's official policy, the evidence still fails to show a connection between the assaults and any county policy, much less any policy attributed to Nargis. Because it does not affect the outcome of this case, we need not resolve the question whether Nargis possessed the requisite policymaking authority to establish an official policy within the meaning of *Monell*.

After that, we address whether Christensen's constitutional violations were a highly predictable consequence of the jail's failure to train its staff allowing for single-incident liability. Last, we consider the sufficiency of the evidence in light of the county's motion for judgment as a matter of law, which the district court denied.

### 1. *Express policies*

The express terms of the jail's sexual assault policies (I-100 and C-202, described above) are not constitutionally suspect, per plaintiffs. Instead, they challenge alleged gaps or omissions in those policies. Plaintiffs contend the policies do not provide adequate measures to prevent and detect sexual assault—namely, measures suggested by PREA. "[T]he absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." *Calhoun*, 408 F.3d at 380 (citing *Bryan Cty.*, 520 U.S. at 409 and *Canton*, 489 U.S. at 388).

On this theory, the county's culpability hinges on whether it was deliberately indifferent to an obvious need to update or enhance its sexual assault policies. Liability could be established by showing the county adhered to a policy that it knew, or should have known, failed to prevent assaults by jail staff. But plaintiffs supplied no evidence of policy violations putting the county on notice of a sexual assault problem to resolve or act upon. *Cf. Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) (affirming judgment under *Monell* where evidence showed contractor violated the defendant's express policies and repeatedly failed to act in the

face of known violations). Even plaintiffs' expert, Eiser, conceded the Jorgenson incident did not downgrade the jail's good record on this front.

To try to address this lack of evidence, on appeal plaintiffs interline a proposition in *Glisson* with bracketed materials: "the existence of the [PREA] Guidelines, with which [Nargis] was admittedly familiar, is evidence that could persuade a trier of fact that [Polk County] consciously chose the approach that it took." Brief of Plaintiffs-Appellees at 33, *J.K.J. v. Polk Cty.*, Nos. 18-1498 and 18-2170 (7th Cir. Oct. 3, 2018), quoting *Glisson*, 849 F.3d at 380. But *Glisson* concerned whether a defendant "had a policy to eschew any way of coordinating [health] care." *Id*. at 381. Here, the county enforced, rather than avoided, written policies prohibiting any form of sexual contact. Plaintiffs' *Glisson* "parallel" ignores that municipal fault still must be established. Without knowledge of an obvious risk, plaintiffs' argument is unavailing.

Plaintiffs fare no better blaming the county for underuse of PREA. Their argument implies PREA binds states to implement and enforce its guidelines. But PREA, a federal statute, imposes no such obligations on county-run jails. *See* 34 U.S.C. §§ 30301–09. Wisconsin law governs the county's sexual assault policies, and its prohibition of sexual contact between guards and inmates is absolute. WIS. STAT. § 940.225(2)(h); *see also Ramos v. Hamblin*, 840 F.3d 442, 444 (7th Cir. 2016) (noting Wisconsin DOC rules corresponding with PREA make the prevention of prison rape a "priority concern"). Likewise, the county's policies prohibit such contact, and the county showed that its policies fully complied with all applicable Wisconsin statutes and regulations. Wisconsin may elect to

adopt or fully comply with PREA standards. *See* 34 U.S.C. § 30307(e)(2)(A). But where Wisconsin has not incorporated components of PREA into its laws and regulations, it is beyond the role of federal courts to render those components a constitutional requirement. *See Bryan Cty.*, 520 U.S. at 415 (admonishing that "[a] failure to apply stringent culpability and causation requirements raises serious federalism concerns" and "risks constitutionalizing" requirements states have not chosen to impose).

"[D]eliberate indifference is a stringent standard of fault," and not even a showing of heightened negligence will suffice to establish liability. *Bryan Cty.*, 520 U.S. at 407, 410. Proof is required that a county policymaker disregarded a known or obvious consequence of his action or inaction. *Id.* at 410; *see also Connick*, 563 U.S. at 61 (citation omitted). Here, PREA might have been relevant to show a conspicuous flaw in the county's policies, but the record shows no evidence of such a flaw. When Christensen assaulted plaintiffs, the jail had no history of sexual assaults and operated under zero-tolerance sexual assault policies. Eiser's ratification of the jail's "good record" before the jail learned of Christensen's sexual assaults shows that the jail reasonably relied on the effectiveness of its express policies. In the absence of other evidence, we conclude no rational jury could infer that the jail's express policies were obviously deficient, that the county was or should have been aware that jail policies were inadequate, that assaults were imminent, or that PREA sets the norm.

As for causation, plaintiffs offered no facts at trial from which the jury could conclude that a gap in the county's express sexual assault policies caused their injuries. *See Bryan Cty.*, 520 U.S. at 406 (observing that challenges to a facially valid municipal policy "present much more difficult problems of proof"). Nor on appeal do plaintiffs point to any such facts. The Supreme Court demands that courts "carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id*. at 410. After examining the express policies here, we cannot conclude the county was culpable for, or its sexual assault policies caused, Christensen's assaults.

### 2.  *Implicit policy*

The county's *real* policy was to ignore its policies, according to plaintiffs, as shown by Nargis's admission of tier talk, the tizzy email, inappropriate staff comments, and the Jorgenson investigation. Plaintiffs contend the sum of these improprieties resulted in a widespread practice of allowing and encouraging sexual misconduct.

Nargis was a focal point of plaintiffs' implicit policy claim, beginning with the allegation that he promoted a "toxic culture" by participating in tier talk and acceding to offensive remarks by jail staff. In our de novo review of the record, however, this allegation lacks support. The only reference at trial to "tier talk" occurred during plaintiffs' examination of Nargis. And when Nargis admitted to "tier talk," he did so only within plaintiffs' limited definition ("not necessarily flattering talk"). Plaintiffs failed to include that their definition encompassed a sexual subtext. Rather, plaintiffs grafted a sexual connotation onto the term after trial in response to the

county's appeal.[4] The record also contains no evidence that Nargis's tier talk was sexually explicit, profane, or insensitive. Despite this evidentiary void, plaintiffs mischaracterize the record in their response on appeal: "Captain Nargis routinely engaged in sexually explicit 'tier talk.'"[5]

Our dissenting colleague concludes that a reasonable jury could find that Nargis's tier talk was sexual in nature. But we believe this inference relies on plaintiffs' post-trial rebranding of the phrase. Although we view the facts in the light most favorable to the jury's verdict, we are not required to draw unreasonable inferences. *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010). Only reasonable inferences may be considered. *See Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir. 1984). At trial, in questioning other witnesses about indecent remarks, plaintiffs routinely and frequently used concrete and specific terms such as "sexual comments," "inappropriate comments," and "sexual harassment." None of these defined terms were used when plaintiffs questioned Nargis

---

[4] The district court's order on the county's Rule 50 motion also assumes "tier talk" had a sexual implication despite the lack of any trial evidence or definitional reference that "tier talk" included a sexual component. *See* Opinion and Order at 8–9, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 5, 2018), ECF No. 279.

[5] Appellees' Br. at 14. This was not the only mischaracterization in that brief. Steven Schaefer testified that all jail officers were required to attend countywide training on sexual harassment, which included the jail's prohibition of sexual assaults. At times, Schaefer even gave the training. But plaintiffs' appeal brief declares: (1) "Sergeant Steven Schaefer also testified to never receiving any training regarding sexual assault"; and (2) Manning and Schaefer "unanimously agreed that they received no training on sexual assault at any time." Appellees' Br. at 13. Counsel for plaintiffs said the same during closing arguments.

about tier talk. We therefore cannot assume that Nargis's admission of "not necessarily flattering talk" means "sexual talk." Instead, we take plaintiffs at their word that "tier talk" means what they told Nargis it means. That Nargis conceded to nondescript tier talk does not prove that he promoted a "toxic culture." Nor does it prove the county ignored relevant policies.

The claim based on the "tizzy email" that Nargis mocked and disliked PREA also does not help plaintiffs. Even if we assume Nargis on one occasion discredited PREA, this does not constitute a policy of permitting sexual assaults. Nor can we infer that a supervisor's one-time use of a condescending noun ("tizzy") establishes a conscious disregard for measures to prevent sexual assaults.

As for inappropriate remarks by staff, plaintiffs introduced the following evidence: (1) J.K.J. testified two officers overheard Christensen making flirtatious comments to inmates; (2) Christensen testified he overheard three guards make suggestive remarks to inmates; and (3) Nargis knew of two inappropriate remarks made by Christensen over a twelve-year period.[6] We consider whether this proof reflected an implicit policy under the applicable law.

*Monell* claims based on an unconstitutional implicit policy require proof of a "widespread" practice. *See Bryan Cty.*, 520

---

[6] Sergeant Schaefer testified that Jorgenson made one "or maybe two" inappropriate comments to him over a nine-year period. Because Schaefer did not believe the comments rose to a level warranting discipline, however, he neither reported them to management nor explained the nature of those comments at trial.

U.S. at 404; *see also Monell*, 436 U.S. at 692 (defining a widespread practice as one that is "persistent," "permanent," and "well settled"). "[P]roof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) (citation omitted) ("A series of violations is necessary"; two incidents in one year is not enough). The offensive comments overheard by J.K.J. and Christensen are unclear; no evidence was adduced as to exactly what was said, the context of the remarks, or when they were said. Nor were these comments reported to Nargis or any other jail supervisors. These two allegations of unreported and undefined remarks (outside of those later learned during the Jorgenson investigation) here are insufficient to show a widespread custom or practice. *See Doe v. Vigo Cty., Indiana*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding three incidents of sexual contact, two instances of inappropriate remarks, two allegations of sexual harassment, and one example of cornering an employee for sex, taken together, failed to establish a widespread county practice).[7] Likewise,

---

[7] On a number of occasions this court has considered the quantity and frequency of violations required to qualify as a "widespread" pattern or practice in a correctional facility. *See Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) (36 suicide attempts and three successful suicides in five-year period does not evidence that the jail's suicide prevention policies are inadequate); *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (783 excessive force complaints at jail over a 5-year period, none of which resulted in an indictment, does not support inference of a widespread practice of excessive force); *Klebanowski v. Sheahan*, 540 F.3d 633, 638 (7th Cir. 2008) (the recovery of 14 shanks after two gang attacks, one of which involved a stabbing by a shank, is insufficient to establish the existence of a widespread practice of allowing gang members

Nargis's personal knowledge of two inappropriate remarks by Christensen over twelve years falls short of indicating a widespread unconstitutional practice. *See Palmer*, 327 F.3d at 596 (concluding personal knowledge of two incidents of misconduct by officers in a period of one year is insufficient to indicate a widespread practice). Given the law's requirements, including as to quantity and to frequency, we do not conclude these suggestive and inappropriate remarks amounted to a "widespread practice" so as to constitute an unconstitutional implicit policy.

Next, plaintiffs contend the Jorgenson investigation gave the county sufficient notice that its sexual assault policies were deficient. The allegations of Jorgenson's improper contact—including putting his arm around an inmate's waist, and patting her backside—while on the same spectrum of sexual harassment and assault as Christensen's conduct, are not of the same degree as Christensen's repeated and coercive sexual abuse. *See Vigo Cty.*, 905 F.3d at 1045 (distinguishing between sexual harassment and the trauma of sexual assault).

Nevertheless, the record shows the jail responded equally to these two incidents. After two investigations, the jail found

---

to keep weapons in their jail cells); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("One broad, vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a 'widespread' custom."); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759–60 (7th Cir. 2005) ("[Three incidents of improper use of pepper spray] do not amount to 'a widespread practice' that is 'permanent and well settled' so as to constitute an unconstitutional custom or policy about which the sheriff was deliberately indifferent.").

it "probably more likely" Jorgensen engaged in "inappropriate touching," but it was unable to confirm the allegations. *See id*. at 1047 (holding no breach of duty to plaintiff where "the County investigated but could not substantiate one vague complaint against Gray, and it warned him for making sexualized comments to a coworker"). Unverified allegations of inappropriate touching of and humiliating comments toward one inmate over a nine-year period[8] falls short of establishing a widespread practice or custom. *See id.* at 1046–47 ("A business is not alerted to the possibility that an employee might rape a member of the public by having faced the occasional, but unfortunate, predicament of employee sexual harassment, including groping."). We also note, once more, that plaintiffs' expert agreed the jail had a good record on this topic, including when considering the Jorgenson incident.

The evidence gleaned from Jorgenson's human resources investigation runs into the same problems. The county does not dispute Jorgenson's comments to female coworkers were inappropriate. And plaintiffs do not dispute those comments went unreported until the N.S. investigation. Even if the county was somehow responsible for Jorgenson's boorishness, it was not deliberately indifferent to whether the problem continued. When staff notified the county of Jorgenson's behavior, an investigation ensued, showing the county's diligence, and Jorgenson resigned. *See Vigo Cty.*, 905 F.3d at 1046 ("[A]ccepting resignations in lieu of firings [does not] reflect[] the County's deliberate indifference.").

---

[8] Plaintiffs' expert, Eiser, reviewed the jail's records from 2008 to the date of plaintiffs' trial in 2017.

Our recent decision in *Vigo County* is instructive on the quantum of proof necessary to establish a county's custom or practice of failing to prevent or respond to its employees' sexual misconduct. In that case, the plaintiff, Doe, volunteered at a park where Vigo County's employee, David Gray, worked. Doe alleged Gray locked her in the park's restroom area and forced her to perform oral sex and digitally penetrated her vagina. *Vigo Cty.*, 905 F.3d at 1041. Gray was charged with rape, criminal confinement, and official misconduct, and he was convicted of the latter two offenses. *Id*.

Doe sued Vigo County, alleging it failed to take seriously or to address a risk of sexual violence posed by its employees. *Id*. at 1044–45. The record contained no evidence of any county employee having forced another to engage in a sexual act or having confined an individual to harm her. *Id*. at 1045. Instead, the record revealed "[s]ome involved sexual misconduct, but none resulted in coerced sexual activity, nor does the record suggest that employee misconduct occasioned impunity." *Id*. at 1045.[9] This court held that "a handful of incidents of misconduct by employees of Vigo County" over the

---

[9] In *Vigo County*, this court held the following offenses by county employees, among others, were "not enough to establish a custom or practice giving rise to Doe's injuries": (1) a jail guard was prosecuted for having sexual contact with an inmate at the county jail; (2) the county recorder pleaded guilty to battery for groping an employee; (3) a parks mechanic was accused of inappropriately cornering one coworker, telling another that he wanted to have sex with her, and placing his hands on the latter's breast and down her pants; (4) another parks employee was fired for treating coworkers poorly and making an "off-color" comment to another employee; and (5) a civil complaint was filed accusing a highway department supervisor of sexual harassment. 905 F.3d at 1045. Specific to the public park where plaintiff was assaulted, evidence showed that her attacker,

past 20 years, "is not enough to establish a custom or practice that gave rise to Doe's injuries, nor can it support a finding of indifference on the part of Vigo County officials." *Id*.

Like *Vigo County*, in this trial plaintiffs failed to put forth evidence of any jail employee engaging in criminal acts like Christensen. The other allegations plaintiffs recount, though contemptible, are different from the trauma plaintiffs experienced. *See id*. And because plaintiffs rely on indirect proof of a widespread practice, they "must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. Cook Cty.*, 819 F.3d 343, 348 (7th Cir. 2016) (citation omitted). Nargis's tier talk, the tizzy email, rare and unreported staff comments, and the Jorgenson investigation do not amount to evidence of persistent or pervasive sexual misconduct so obvious as to imply acquiescence of county policymakers. Above all, plaintiffs offered no evidence county officials knew or should have

---

Gray: (1) acted inappropriately to a park visitor's wife; and (2) received a reprimand for inappropriate comments made to a coworker. *Id*.

Our dissenting colleague sees these previous incidents dispersed "throughout the county," but we see them differently. Four involved employees from the same county parks department, and two involved the same park and the same employee who assaulted the plaintiff in that case. The decision also references that a parks department employee other than Gray physically accosted one employee and sexually assaulted another. Despite all of these incidents, this court held that the plaintiff failed to show Vigo County's deliberate indifference toward sexual misconduct. *Id*. at 1046.

known that any of its practices or customs would allow or en-
courage—much less cause—Christensen to commit the ab-
horrent acts which happened to plaintiffs.

Because the trial evidence contains no facts that plausibly
suggest a widespread practice of sexual assaults or acquies-
cence to sexual conduct at Polk County Jail, the record does
not support a finding that the county maintained an implicit
policy that that served as the cause of their injuries.

### 3.  *Failure-to-train*

Plaintiffs' third liability theory is that the county's training
"was entirely deficient and independently established delib-
erate indifference." This failure-to-train theory runs into dif-
ficulties. On the evidence presented at trial, it allows a jury to
conclude liability outside the correct legal framework, and it
relies on inferences expressly rejected by the Supreme Court.
Further, the trial record does not show a direct causal link be-
tween the alleged failure to train and their injuries as required
by *Monell* and its related case law.

On appeal of a jury verdict, we afford a generous standard
of review to avoid supplanting our view of the credibility or
the weight of the evidence for that of the jury. *Massey v. Blue
Cross-Blue Shield of Illinois*, 226 F.3d 922, 925–26 (7th Cir. 2000)
(affirming judgment as a matter of law overturning verdict in
plaintiff's favor because evidence failed to support the jury's
finding of discrimination). But juries are not free to disregard
governing legal standards. On the question of municipal lia-
bility, *Monell* and its limits control the calls juries are allowed
to make, including for failure-to-train claims. *See*, e.g., *Canton*,
489 U.S. at 399 (O'Connor, J., concurring in part and dissent-
ing in part) ("Allowing an inadequate training claim such as

this one to go to the jury based upon a single incident would only invite jury nullification of *Monell*.").

A failure-to-train claim fails without a pattern of similar violations, unless that claim "fall[s] within the narrow range of 'single-incident liability' hypothesized in *Canton*." *Connick*, 563 U.S. at 71–72 ("[A] pattern of violations [is] necessary to prove deliberate indifference in § 1983 actions alleging failure to train."); *see also Canton*, 489 U.S. at 390 n.10. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) ("[A] policy of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.")). Here, plaintiffs agreed there is no pattern of similar violations at the jail to establish deliberate indifference.[10] In so doing, they deny proof of a fundamental element of failure-to-train liability.

The degree of culpability in failure-to-train cases must amount to deliberate indifference. *Connick*, 563 U.S. at 63. Although plaintiffs do not contend they proved a pattern of similar violations, they claim "myriad evidence" of inadequate training supported a finding of deliberate indifference. *See, e.g., id.* at 62. But plaintiffs' contention here requires reliance on the same chain of inferences rejected in *Connick*. In *Connick*,

---

[10] *See* Appellees' Br. at 45 n.10 ("Plaintiffs do not argue on appeal that deliberate indifference is established here due to a pattern of similar past incidents."). Also, the district court held "that plaintiffs failed to put forth sufficient evidence to support finding a pattern of constitutional violations known to policy-makers." Opinion and Order at 7, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 5, 2018), ECF No. 279.

the Court analyzed whether failure-to-train liability could be imposed on a district attorney's office for a rogue prosecutor's deliberate violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Court declined to conclude four prior *Brady* violations was a pattern of similar violations. *Connick*, 563 U.S. at 54, 62-63. Without such a pattern, the plaintiff could not prove that the district attorney had actual or constructive notice of, and was therefore deliberately indifferent to, a need for more or different *Brady* training. *Id*. at 59, 61–63, 72. As a result, the district court's $14 million judgment against the district attorney was overturned. *Id*. at 72.

Here, we consider whether failure-to-train liability may be imposed on the county for a rogue guard's deliberate violation of jail policy, county training, and Wisconsin law. We follow *Connick's* approach, which required incidents "similar to the violation at issue" to "put [a policymaker] on notice that specific training was necessary to avoid this constitutional violation." *Id*. at 62. "Without notice that a course of training is deficient in a particular respect"—here, the prevention of sexual assaults—"decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62–63.

Under *Connick*, we conclude the evidence before the jury could not, standing alone, have prompted notice that more or different training was necessary to prevent similarly appalling violations. Jorgensen's alleged actions and behavior were wrong and degrading. Yet these twice investigated but unverified allegations, including placing his hands around N.S.'s waist and touching her backside, along with Jorgenson's

other reproachable conduct, do not prompt notice that specific training was necessary to avoid Christensen's repeated sexual assaults.

Because the trial evidence contained no instances or pattern of comparable actions, the county cannot be said to have adhered to an approach that it knew or should have known failed to prevent similar violations. *Connick*, 563 U.S. at 62; *Bryan Cty.*, 520 U.S. at 409. A failure-to-supervise claim fails for the same reasons. The record does not establish a likelihood of the type of harm plaintiffs suffered to have obligated the county to prevent its occurrence. *See Vigo Cty.*, 905 F.3d at 1046 (holding same).

The dissent concludes three "primary points" prompted notice that more training was required: (1) Nargis's tier talk; (2) information gleaned from the Jorgenson investigation; and (3) irregular examples of inappropriate remarks by certain guards over a twelve-year period. But as offensive as they are, none of these points involved the clandestine and conscience-shocking repeated sexual assaults of inmates. To demonstrate deliberate indifference to the risk of constitutional violations, *Connick* requires "[a] pattern of *similar* constitutional violations by *untrained* employees." *Connick*, 563 U.S. at 62 (emphases added). The record shows no pattern of violations similar to Christensen's conduct, and importantly, no dispute that Christensen was trained that his conduct was illegal.[11] In fact,

---

[11] *See* Transcript of Jury Trial at 63–64, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 1, 2017), ECF No. 258 (testimony of Christensen): "Q: Now, did you tell Chief Deputy Moe, gee, I didn't think I did anything wrong because you didn't train me? A: No sir."

at trial Christensen admitted he did not require more training to know his conduct was a crime.[12] For these reasons, we respectfully part ways with our dissenting colleague's failure-to-train evaluation.

To be sure, "[i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." *Bryan Cty.*, 520 U.S. at 407. To show the county ignored such notice, plaintiffs must produce evidence "of a series of constitutional violations from which deliberate indifference can be inferred." *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000); *see also Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2014) (holding plaintiffs failed to "show[] that there was a 'series of unconstitutional acts from which it may be inferred that the [sheriff] knew [correctional center] officers were violating the constitutional rights of [correctional center] inmates and did nothing'") (quoting *Estate of Novack*, 226 F.3d at 531). In failure-to-train cases, the constitutional violations must be "similar to the violation at issue," *Connick*, 563 U.S. at 63; here, sexual assaults.

Yet Christensen's assaults on plaintiffs were both hidden and unprecedented. Testifying on these facts, plaintiffs' prison training expert agreed the county had a good record—even factoring in Jorgenson's misconduct—because of the lack of incidents of sexual contact between guards and inmates, let alone coercive assaults like Christensen's. *Cf.*

---

[12] *See* Transcript of Jury Trial at 64, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 1, 2017), ECF No. 258 (testimony of Christensen): "Q: You didn't try to tell the circuit court that you did it because you didn't have training and you forgot that it was a crime. You didn't use that as a defense, did you sir? A: No, sir."

*Woodward*, 368 F.3d at 926 (involving systemic failure to en-
force a jail suicide-prevention program). There was no series
of sexual assaults at the jail from which the county was aware
its sexual assault training was inadequate, and chose to do
nothing in the face of such knowledge. *See Hahn*, 762 F.3d at
637 (holding seven inmate deaths in jail from different causes
than decedent's "do not show that [sheriff] was aware of any
risk posed by [his] policies or that [sheriff] failed to take
appropriate steps to protect [decedent]"). Nor does the trial
evidence show "continued adherence" to training resulting in
flaws exposed by repeated wrongdoing. *Bryan Cty.*, 520 U.S.
at 407. *Connick* presents stringent fault standards for a failure-
to-train claim, and admonishes that unless an exception
applies, failure-to-train liability is available only when "a pat-
tern of similar violations" establishes a "policy of inaction."
*Connick*, 563 U.S. at 72.[13]

Even if the trial record showed sufficient evidence the
county failed to train, that record still must contain proof of
causation. When evaluating *Monell* claims, the Supreme
Court has instructed courts to adhere to "rigorous" causation
requirements. *Bryan Cty.*, 520 U.S. at 415.

The trial evidence showed that the "moving force," *id.* at
404, behind the assaults on plaintiffs was not a failure to give

---

[13] The dissent suggests that under *Glisson* "the key" in evaluating a
failure-to-train claim "is whether there is a conscious decision not to take
action," irrespective of whether the record reflected examples of similar
constitutional violations. *See Glisson*, 849 F.3d at 381. But *Glisson* involved
a failure to enact a policy, not a failure to train employees. *Id.* at 382 (hold-
ing an inmate healthcare provider could be liable under § 1983 for failing
to establish any protocol for the coordinated care of inmates with chronic
illnesses).

jail guards additional training. Rather, it was a predatory employee—who does not merit the term "guard"—who furtively abused his power and preyed upon inmates. From the witness stand, Christensen confessed his behavior was irrepressible: he admitted he was trained his actions were criminal and violated jail policy; he agreed he did not require more training to know his assaults were a crime; he knew he was placing plaintiffs at risk; and he operated under the delusion that his conduct was welcome, consensual, and a product of "mutual voluntary attraction." When juxtaposing these facts with the absence of any similar violations at the jail, Christensen—not a failure to train—was the moving force behind the deprivation of plaintiffs' federal rights.

At trial and on appeal, plaintiffs have offered no more than conclusory assertions that Christensen's lack of training caused their injuries. The trial record also does not reveal an affirmative link between a failure to train and plaintiffs' injuries. The dissent identifies this gap—"[w]hat was missing"—and cites the need for more training on "the inherent vulnerability" of the confinement setting, as well as the harm caused by sexual abuse. "But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68. "Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Id*. (internal brackets and quotation marks omitted). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392 (citing *Tuttle*, 471 U.S. at 823 (plurality

opinion)). Even plaintiffs' expert on prison training stand-ards, Eiser, conceded no proof exists that better or more train-ing could have dissuaded Christensen from his predatory behavior and established causation.[14]

Our dissenting colleague warns of the risk of sexual attacks at jails "employing male guards to supervise female inmates." But *Connick* requires more than "the broader con-text" of male guards supervising female inmates to establish causation. It does not follow that all male guards will "so ob-viously make wrong decisions that failing to train them amounts to 'a decision by the [county] itself to violate the Constitution.'" *Connick*, 563 U.S. at 71 (quoting *Canton*, 489 U.S. at 395). *Connick* sets the bar higher:

> To prove deliberate indifference, Thompson needed to show that Connick was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, Thompson had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights.

*Connick*, 563 U.S. at 71 (citing *Bryan Cty.,* 520 U.S. at 409, and *Canton*, 489 U.S. at 389) (emphases in original). This trial evi-dence does not clear that bar, and there are no gray areas to the zero-tolerance policy in question. A finding of liability on a failure-to-train theory here cannot be reconciled with the

---

[14] *See* Transcript of Jury Trial at 47–48, *J.K.J. v. Polk Cty.*, No. 15-CV-428 (W.D. Wis. Feb. 1, 2017), ECF No. 264.

reasoning of *Connick*, and would rest more on good policy prescriptions than proof of municipal fault and causation. And whether noteworthy recommendations for jail training are legal requirements is something for the people of Wisconsin and their elected officials to decide, rather than our court in this context.

### 4.  *Single-incident theory*

In the absence of a pattern of similar assault violations, another liability theory is that the county failed to train its guards in light of foreseeable sexual assaults. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983*." Connick*, 563 U.S. at 61; *see also Canton*, 489 U.S. at 390 n.10. *Canton* left open the possibility that a plaintiff might succeed in a failure-to-train claim without showing a pattern of constitutional violations. *See Connick*, 563 U.S. at 63, 71–72 (describing as "single-incident liability"). The Supreme Court "hypothesized" in *Canton* that "a violation of federal rights may be a highly predictable consequence" for failing to train police officers about constitutional limits on the use of deadly force. *Id*. at 63–64, 71–72. In *Canton*, the Court required that "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." 489 U.S. at 391.

The single-incident theory of liability described in *Canton* "assumes … no knowledge at all" of the required constitutional standards. *Connick*, 563 U.S. at 67. Without specific training, explained the Court, a police officer would not be "equipped with the tools to interpret and apply legal princi-

ples." *Id*. at 64. In *Connick*, the Court contrasted this hypothet-
ical with an attorney asked to make a *Brady* determination. In
that situation, and in the absence of a pattern of similar *Brady*
violations, a district attorney "is entitled to rely" on prosecu-
tors' law school or bar exam training, ethical obligations, and
on-the-job experience, to deal with *Brady* decisions. *Id*. at
66-67 ("A licensed attorney making legal judgments, in his ca-
pacity as a prosecutor, about *Brady* material simply does not
present the same 'highly predictable' constitutional danger as
*Canton's* untrained officer."). "In light of this regime of legal
training and professional responsibility, recurring constitu-
tional violations are not the 'obvious consequence' of failing
to provide prosecutors with formal in-house training about
how to obey the law." *Id*. at 66. Accordingly, the failure of
Connick's office to alert its prosecutors of all reasonably con-
ceivable legal duties did not subject it to failure-to-train liabil-
ity, even if "additional training would have been helpful." *Id*.
at 68.

Here, the proof at trial does not fit within *Canton's* single-
incident hypothetical. First, we cannot assume "no
knowledge at all," because Christensen was trained and knew
that his actions were criminal. Given this knowledge and
training, Christensen's assaults—in which he was a lone and
surreptitious actor—were not a "highly predictable conse-
quence" (*Bryan Cty.*, 520 U.S. at 409) of the county's sexual
assault policies. Second, unlike the nuanced and compound
legal standards contemplated in *Canton* (involving constitu-
tional limits on the use of deadly force) and *Connick* (involv-
ing evidentiary disclosure obligations), the legal standard
here involved a direct, non-discretionary rule: no sexual con-
tact with inmates. Third, the record shows the county's
guards—including Christensen—were trained on their legal

and professional obligations to avoid the constitutional violation at issue, sexual relationships with inmates. Christensen was thus "equipped with the tools" to obey the law, as *Canton* requires. *Connick*, 563 U.S. at 64. On this record, we decline to find single-incident liability.

### 5.  *Sufficiency of the evidence*

Judgment as a matter of law should not be granted unless the evidence, viewed in the light most favorable to the jury's verdict, shows that no rational jury could return a verdict against the moving party. *Woodward*, 368 F.3d at 926. Although the district court found sufficient evidence to sustain the verdict in Nargis's "awareness of tier talk," facts culled from the Jorgenson investigation, and the single county-sponsored PREA training session, ultimately we disagree.

In our de novo review, plaintiffs failed to present enough evidence to support their claims. *Houskins*, 549 F.3d at 493. The facts do not show Christensen "was highly likely to inflict the *particular* injury suffered by the plaintiff[s]." *Bryan Cty.*, 520 U.S. at 412 (emphasis in original). The trial record offers no support that the same or similar constitutional injuries were foreseeable. So far as the record reveals, the county had no reason to believe, before the events giving rise to this case, that its training or supervision of Christensen was inadequate. Besides, there is no evidence of a pattern of constitutional violations making it "known or obvious" that additional training or enhanced policies were necessary. *Id*. at 407, 410; *see also Connick*, 563 U.S. at 61. The trial record does not contain evidence from which a rational jury could find the county knew of, but was deliberately indifferent to, a risk that inmates' constitutional rights would be violated.

Even if the record contained evidence of culpability, plaintiffs needed to show a direct causal connection between a county policy, practice, or custom and their injuries. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("[I]n other words that the policy or custom was the moving force behind the constitutional violation."). Given the absence of causation evidence, the record can only be read that Christensen—not any county policy or failure to train—was the moving force behind plaintiffs' injuries. To hold otherwise under these facts would pin Christensen's acts on the county and allow for vicarious liability, contrary to *Monell*.

The requirements for imposing liability upon the county for Christensen's acts are "rigorous." *Bryan Cty.*, 520 U.S. at 406, 415. Although we do not overturn a jury verdict lightly, we must assure the jury had a legally sufficient evidentiary basis for its verdict. *Filipovich*, 391 F.3d at 863 (reversing verdict awarding back pay and punitive damages because employee failed to present legally sufficient evidence of age discrimination). It is clear to us, *see Houskins*, 549 F.3d at 493, that the trial evidence fails to satisfy the necessary elements under *Monell*, *Canton*, and *Connick* of an imputable policy, culpability, and causation. In the end, these cases (and their related authorities) control the calls a jury is allowed to make. We therefore reverse the verdict against the county and remand for the entry of judgment as a matter of law in favor of the county. Because we reverse the district court's denial of the county's Rule 50(b) motion, we need not reach the county's Rule 59(a) motion.

As noted earlier, Christensen waived his appeal for judgment as a matter of law under Rule 50. So next we address whether Christensen is entitled to a new trial under Rule 59.

### B. Christensen

Christensen appeals the jury verdict against him on three grounds. First, he claims plaintiffs failed to show that he was at fault for his actions. Second, he alleges the jury instructions misstated the law by allowing a finding of liability without proof of harm or causation. Third, he challenges the jury's determination of damages.

### 1. Christensen's fault

To establish an Eighth Amendment violation against prison officials, "an inmate must show that a defendant was deliberately indifferent to an excessive risk to inmate health or safety." *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (citations omitted). This includes two elements: "the harm to which the prisoner was exposed must be an objectively serious one"; and judged subjectively, the prison official "must have actual, and not merely constructive, knowledge of the risk." *Id*. (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015)). The first element is easily established here: sexual assault against an inmate is always serious. The second element requires the official to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Immunity protects officials who act at the "hazy border" between the lawful and the forbidden. *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004) (citation omitted).

Christensen contends he did not know his sexual relationships posed harm to anyone other than himself. As Christensen sees it, he was the only person who stood to lose anything (his job, his family, and his freedom) because of his

behavior. These claims are as disingenuous as they are unpersuasive. There is no hazy border of the forbidden here: state law and jail policy unequivocally prohibit any sexual contact with inmates and afford no discretion on the matter. Christensen testified he knew his conduct violated county policies, he would be criminally prosecuted if caught, and his actions were "not positive" for plaintiffs. These facts support the jury's finding that Christensen knew about a substantial risk of harm to plaintiffs and disregarded that risk.

Rule 59 allows for a new trial if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party. *Martinez*, 900 F.3d at 844. Christensen quibbles that he never confessed to knowing his actions were wrong, but only that his actions were "not positive." But the law requires only facts supporting a known inference of wrongdoing, not an outright confession of misconduct. Here, a reasonable jury could and did find that Christensen knew a substantial risk of harm shadowed his actions and that he deliberately disregarded that risk. The district court did not abuse its discretion in refusing to grant a new trial on this ground.

### 2. *Jury instructions*

Christensen next argues the district court refused to instruct the jury on causation and harm, which he believes deprived him of his ability to argue consent as a defense. Because plaintiffs allegedly consented to his sexual advances, he contends the jury should have been instructed to consider whether he actually caused harm to plaintiffs.

After the second day of trial, the court proposed the following instruction on harm and consent:

> If you determine that consent has a bearing on your determination of harm, you may consider the following in deciding whether plaintiffs' sexual contacts with defendant Christensen were consensual: the power disparity between prisoners and correctional officers and how that disparity may create a coercive environment. Ultimately, the determination of whether there was consent, and the broader question of whether there was harm, is for you to determine.

Order on Jury Instructions at 4–5, *J.K.J. v. Polk Cty.*, No. 3:15-CV-428 (W.D. Wis. January 31, 2017), ECF No. 238.

The next day during the jury instruction conference for the liability phase, the district court became skeptical, however, that a harm instruction was required. When the court questioned how a reasonable jury could conclude Christensen's conduct was not harmful, Christensen's counsel replied that a harm instruction "goes to consent and whether this was something that ultimately caused the harm being alleged." Christensen's counsel also argued the question of harm "is a close call" and "one for the jury." The court was not persuaded and shifted the harm element from the liability phase to the damages phase; reasoning this was "a compromise" between its skepticism and Christensen's request. Then, after the jury found Christensen liable to plaintiffs, the court asked whether Christensen planned to argue that his conduct was not harmful during the damages phase. Christensen's counsel replied: "No, Your Honor."

In denying Christensen's motion for a new trial, the district court concluded that he had not preserved his objections

to the removal of a harm instruction in either trial phase. We agree Christensen waived his right to appeal for a harm instruction during the damages phase. *See United States v. Kirklin*, 727 F.3d 711, 716 (7th Cir. 2013) ("[C]ounsel's affirmative statement that he had no objection to the proposed jury instruction constitutes waiver of the ability to raise this claim on appeal.") (citation internal brackets omitted).

But Christensen did not waive his objection during the liability phase. Twice Christensen requested a harm instruction during the liability phase. Twice he explained that a harm instruction implicates questions of causation and a defense of consent. These statements sufficiently alerted the court to his request and his argument, allowing us on appeal to reach the merits of this claim.

We review Christensen's challenge to the liability phase instructions in two steps. In step one, "[w]e review de novo whether jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014) (citation omitted). If the instructions are legally accurate, in step two we review the district court's phrasing of the instructions for abuse of discretion. *Id*. We construe jury instructions "in their entirety and not in artificial isolation," reviewing whether the jury "had understanding of the issues and its duty to determine those issues." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 827 (7th Cir. 2010) (citation omitted).

Here, the instructions read:

> To succeed on plaintiff's Eighth and Fourteenth Amendment Claim against defendant Christensen, plaintiff must prove each of the following things by a preponderance of the evidence:
>
>> (1) plaintiff was incarcerated under conditions that posed a substantial risk of serious harm to her health or safety; and
>> (2) defendant was deliberately indifferent to plaintiff's health or safety.
>
> With respect to the claim against defendant Christensen the term "deliberately indifferent" means that he actually knew of a substantial risk of harm and that he consciously disregarded this risk through his actions.

Closing Instructions at 3, *J.K.J. v. Polk Cty.*, No. 3:15-CV-428 (W.D. Wis. February 2, 2017), ECF No. 243.

These instructions align with our court's precedent regarding deliberate indifference liability. *See Sinn*, 911 F.3d at 419 (evaluating deliberate indifference standard as applied to prison guards); *Riccardo*, 375 F.3d at 525 (same). Because the instructions accurately summarize the applicable law, we look to whether the district court's phrasing of the instructions constituted an abuse of discretion. "We will reverse at this second step only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013) (citation and internal quotations omitted).

In Christensen's view, the instructions were misleading because without an instruction on causation, harm, and consent, they reflected an "inadequate understanding of the law." We disagree. The instructions listed the essential elements of deliberate indifference, instructed the jury on plaintiffs' burden to prove these elements, and provided guidance on the meaning of a key term within these elements. Above all, the phrasing of the instructions was uncomplicated and substantively accurate. So Christensen has failed to show abuse of discretion on this point.

Christensen next contends the instructions were "seriously prejudicial" because they "resulted in a finding of liability without any consideration" of whether he caused plaintiffs any harm. But this inaccurately conflates causation and consent. Like any prison guard, Christensen was prohibited from having sex with inmates; plaintiffs' constitutional claims are based on this prohibition. Christensen admits to committing these offenses. Plaintiffs' alleged consent does not make Christensen any less of a cause. To claim otherwise assumes consent voids causation, which it does not.

For their part, plaintiffs testified they did not consent to Christensen's advances. Plaintiffs' expert testified as to the serious mental health trauma plaintiffs suffered, and opined on the amount of damages from their injuries. Christensen offered no rebuttal. The jury's verdict suggests it believed plaintiffs and their expert over Christensen, and "[w]e will not reweigh the evidence, or substitute our credibility assessments for that of the jury." *Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006). Because the omission of a harm or a causation jury instruction was neither misleading nor prejudicial,

we conclude the district court did not abuse its discretion on this point.

### 3. *Damages*

Last, we consider the soundness of the jury's determination of damages against Christensen, beginning with the compensatory damages award. Christensen argues the district court should have granted a new trial because the jury awarded identical compensatory damages to each plaintiff, so the verdicts "lack a rational relationship with the evidence contained in the record."

"We review challenges to the propriety of a compensatory damages award for abuse of discretion." *Kapelanski v. Johnson*, 390 F.3d 525, 532 (7th Cir. 2004). To support his claim, Christensen invokes *Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir.1989), in which our court affirmed the district court's award of a new trial on the issue of damages (with the option of remittitur) because the compensatory damages award did not bear a "reasonable relation to actual injury sustained." *Id*. at 848.

*Cygnar* does not help Christensen. In that case, a jury awarded $55,000 to each plaintiff among thirteen plaintiffs. *Id*. at 833. Christensen asserts we affirmed the grant of a new trial in *Cygnar* solely because the jury gave identical awards to each plaintiff. Not so: we affirmed a new trial in *Cygnar* because the jury gave the same award per plaintiff despite the plaintiffs' "sharp variances" in the amount of economic harm suffered among them. *Id*. at 848. In other words, because the awards in *Cygnar* did not account for obvious differences in harm between plaintiffs individually, we ruled that they did not bear a reasonable relation to the actual injuries sustained.

In contrast, plaintiffs here relied on expert testimony to assert identical economic harms (psychological treatment costs) for the similar noneconomic harms suffered of repeated sexual assaults by Christensen. Christensen counters plaintiffs suffered different pre- and post-assault mental health concerns, and he engaged in sexual contact with each plaintiff with varying degrees of regularity. These "inconsistencies," Christensen argues, precluded the jury from awarding an identical sum to J.K.J and M.J.J.

Christensen fails to explain how plaintiffs' mental health issues and the frequency of his assaults, which plaintiffs endured over years, necessarily translates into different damages awards. He also fails to show the jury's awards were not "in line with other awards in similar cases," in support of his position. *See Cygnar*, 865 F.2d at 848. So the district court did not abuse its discretion when it denied a new trial on the question of compensatory damages.

Christensen also contends the jury's punitive damages awards bear no relation to plaintiffs' harms, necessitating a new trial. But he only asserts "awards of punitive damages cannot be unfettered from due process requirements," and fails to connect that proposition to this case.

We review challenges to punitive damages de novo when constitutional issues are raised. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016) (citations omitted). If no constitutional issue is raised, our review of punitive damages is for abuse of discretion. *Id.* (citation omitted). Whether Christensen challenges the punitive damages award on constitutional or non-constitutional grounds, the outcome is the same.

The Supreme Court has set forth three guideposts to assess a punitive damage award: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the award in this case and the penalties imposed in comparable cases. *Id*. at 1023 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)).

First, we have no difficulty concluding that a reasonable jury could find Christensen's behavior was particularly reprehensible. On guidepost two, "[t]he constitutional limit on punitive damages depends on the reprehensibility of the defendant's conduct and the ratio between compensatory and punitive damages." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018). "[T]he more reprehensible a defendant's conduct and the more easily a defendant can conceal violations, the higher the punitive damages." *Id*. at 953. These awards show the jury found Christensen's conduct to be especially blameworthy. Even so, the ratio between the punitive and compensatory damages awards was less than two-to-one, which is less than the four-to-one ratio "that might be close to the line," of constitutional impropriety. *BMW of N. Am.*, 517 U.S. at 581 (citation omitted). And under guidepost three, Christensen has not offered any cases as comparators.

The district court applied these measures to the jury's verdict and concluded the punitive awards were reasonable and comported with due process requirements. We agree and see no reason to disturb either of the jury awards assessed against Christensen.

### III. Conclusion

Based on this reasoning, we REVERSE the jury verdict against the county and REMAND the case to the district court to enter judgment as a matter of law for the county. The district court's denial of Christensen's motion for a new trial is AFFIRMED.

SCUDDER, *Circuit Judge*, dissenting in part. Two realities combine to make this case very difficult—the respect the law affords jury verdicts and the demanding standard for municipal liability under 42 U.S.C. § 1983 and *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). While the majority opinion marshals the best reasons for reversing the district court's judgment against Polk County, I respectfully dissent from that portion of the opinion. When viewing the evidence in the light most favorable to the jury's verdict, I agree with District Judge Conley that a reasonable jury could have found that Polk County acted with deliberate indifference to the need for more training and monitoring to prevent the sexual assault of female inmates by male guards and in doing so caused the injuries suffered by plaintiffs J.K.J. and M.J.J.

## I

*Monell* unquestionably sets a high bar for municipal liability. A municipality may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). The majority is right that the evidence does not support the imposition of *Monell* liability on the view that the county had an express or implicit policy authorizing the sexual assault of inmates. Nor is this a case where any sort of county policy could be found on the basis of a pattern of past incidents of sexual assaults of female inmates by male guards.

But those are not the only avenues available for *Monell* liability. The Supreme Court has left room for liability premised on a municipality's failure to train its employees when

"in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989); see also *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997) (explaining that "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences") (quoting *Canton*, 489 U.S. at 388).

On these principles, a county's inaction, including its failure to provide adequate training, can amount to "the functional equivalent of a decision by the [county] itself to violate the Constitution," when the county has notice that its program will cause constitutional violations. *Connick*, 563 U.S. at 61–62 (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)); see also *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (observing that the "key is whether there is a conscious decision not to take action"). These "rigorous standards of culpability and causation" safeguard against a municipality being held liable "solely for the actions of its employees." *Bryan County*, 520 U.S. at 405.

But rigorous does not mean impossible, and J.K.J. and M.J.J. sought to carry their burden of proving Polk County's deliberate indifference to the need for more training and monitoring by focusing the jury on three primary points: the county's sparse training on its policies prohibiting the sexual

abuse of inmates, a jail culture that denigrated women, and the county's deficient response to the 2012 incident involving guard Allen Jorgenson and a female inmate. Each point warrants careful consideration, with the controlling question being whether *any rational jury* could have concluded that the combined evidence supports a finding of liability against the county. Setting aside a jury verdict on the basis of insufficient evidence is serious business. See *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 926 (7th Cir. 2004).

## A

*Polk County's Policies and Sexual Assault Training*: All agree that Polk County's written policies categorically prohibit sexual contact with inmates. But so too should everyone agree that policies cannot exist on paper alone. It is not enough in this context to print the policy in a handbook, distribute it to all jail guards, and tell them to follow it. Training is critical precisely because it reinforces that strict adherence to the policy is required and indeed what most matters. And this is especially so in the context of a county employing male guards to supervise female inmates—a circumstance that is perhaps more the norm than the exception around the country, but which inheres with meaningful risk. It takes little foresight to envision an instance where a guard grows too comfortable, loses his better angels, and steps over the clear line marked in Polk County's written policies.

The trial evidence showed that Polk County's training on preventing the sexual harassment and abuse of inmates was sparing at best. The training consisted almost exclusively of informing guards of the easy and obvious—that the jail's policies prohibited sexual contact with inmates. What was missing stands out. The jury heard no evidence of guards being

informed of the inherent vulnerability the confinement setting presents to female inmates. Nor was there evidence of the county either explaining the serious harm that can befall an inmate sexually abused by a guard or taking steps to train guards to hold each other accountable to the county's bright-line prohibition on any intimate contact with inmates. The record shows that the only training dedicated to preventing the sexual assault of inmates by guards came in a single session on the Prison Rape Elimination Act in 2014—well after much of Darryl Christensen's abuse of J.K.J. and M.J.J. had occurred.

At an even broader level there was no evidence that the county included the female inmates themselves in its efforts to prevent sexual abuse. The jury, for example, heard no account of the county ensuring or reinforcing that inmates had access to a safe and confidential channel through which to report inappropriate sexual conduct by jail guards.

Do not overread these observations as somehow prescribing what the county had to do to avoid liability. The observations serve only to show that the county's training was so thin that its inadequacy could have informed the jury's ultimate finding of deliberate indifference.

*The Culture of the Polk County Jail*: At trial the jury learned that Captain Scott Nargis was aware of sexual comments made by male guards about and towards female inmates. Nargis testified that he heard Christensen comment on a female's "rear end," while also learning from others that Christensen had made inappropriate comments about an inmate's breasts. Captain Nargis further testified that he himself occasionally participated in so-called "tier talk"—consisting of "not necessarily flattering talk amongst co-workers." While

the majority concludes that the tier talk of which Nargis was aware was not sexual in nature, there is no way to view the testimony about tier talk as compelling the jury to reach that conclusion. Rather, the record shows that Nargis recalled instances in which the banter among the guards included sexual comments about females within the facility, including at least one female inmate. At the very least, a reasonable jury could have found that the jail's administrators did little to reinforce the dignity and respect owed female (and indeed all) inmates and instead seemed to enable a culture that condoned the sexual objectification of female inmates by male guards. Judge Conley saw the evidence much the same way in denying the county's post-trial motions for judgment as a matter of law and a new trial.

Unfortunately, there is more. The record shows that the jail's culture extended beyond tier talk, as evidenced by the allegations and resulting investigation of another guard, Allen Jorgenson.

***Polk County's (Non) Response to the Jorgenson Incident***: In early 2012 jail administrators received a complaint that Jorgenson had engaged in sexual contact—"inappropriate touching" to be exact—with a female inmate. The allegations also included concerns that Jorgenson used security cameras to fixate on female inmates and told inmates to expose themselves to him. Captain Nargis also learned that jail staff, as part of screening outgoing inmate mail, had reported seeing multiple references to Jorgenson's inappropriate behavior toward female inmates and staff.

Captain Nargis and Chief Deputy Steven Moe responded by conducting an investigation and concluding that Jorgen-

son had violated the jail's policies and deserved a written reprimand. The investigation confirmed that Jorgenson used security cameras on multiple occasions to focus on female inmates longer than necessary and flirted with female inmates generally. Though unable at first to substantiate that Jorgenson engaged in sexual contact with the inmate in question (in no small part due to the inmate's denial that any sexual contact had occurred), Nargis and Moe nonetheless found that Jorgenson pursued an improper personal relationship with the inmate.

More then came to light when the inmate submitted a letter recanting her prior denial of sexual contact with Jorgenson. The incidents described in the letter were detailed and specific, to say nothing of disturbing, and served to put Nargis and Moe on notice of allegations of repeated predatory behavior by Jorgenson. The inmate recounted much more than petty flirtation, reporting that "[t]here are many things he [Jorgenson] has said and done that have been inappropriate in a sexual manner towards me," including, for example, telling me "he has wanted me to lift my shirt," "seeing us in the shower" and calling it a "nice show," touching my "back and butt," "lean[ing] over the [work] cart to look down my shirt," saying "he wants me to ride topless in his boat," and instructing me to "keep quiet."

The letter prompted Nargis and Moe to take a fresh look at the matter. Sergeant Steven Schaefer spoke with the inmate to verify her report and concluded that she may have been telling the truth at that point. At trial Moe acknowledged that, after the jail received the letter, he found it "more likely" that Jorgenson had engaged in inappropriate or even illegal touching of the inmate. In the end, however, the county left in place

its original reprimand of Jorgenson, only then to see him re-
sign a short time later when female coworkers complained
that he had made inappropriate comments towards them.

The majority opinion risks the misimpression that Jorgen-
son's conduct was isolated to putting his arm around an in-
mate and patting her backside. The inmate's letter put the
county on notice of much more, or at least a reasonable jury
could have so concluded. By its terms, the letter conveyed de-
tailed allegations of repeated sexual misconduct, including
physical touching, by Jorgenson. While the majority might be
right to observe that the jury heard no direct evidence demon-
strating that Captain Nargis or Chief Deputy Moe undertook
their investigation in bad faith, that observation answers the
wrong question. The jury was entitled to conclude that, sepa-
rate and apart from whatever discipline was owed Jorgenson,
the county had a plain example of predatory sexual behavior
staring it in the face.

A broader takeaway was available to the jury on this evi-
dence: apart from reprimanding Jorgenson, the county took
no action to reinforce its sexual assault policies with all other
male guards. The county did not, for example, seek to learn
why its policies aimed at protecting inmates from sexual as-
sault and harassment were going unheeded or whether its
culture—including the sexual commentary about and to-
wards female inmates—contributed to Jorgenson's actions.
Nor did the county hold a formal training session, or even a
short informal meeting, to remind guards of the clear and ab-
solute prohibition on any and all sexual contact with inmates.
Indeed, Sergeant Schaefer testified that, after the Jorgenson
incident, the guards received no training regarding inappro-
priate sexual conduct towards inmates. The jury likewise

heard no evidence of the county taking any steps to monitor its male guards' compliance with its policies.

To be sure, Polk County was not required to take any one of these particular measures. See *Glisson*, 849 F.3d at 380. And it emphatically is not our place to instruct a municipality on how to implement its sexual assault policies. The essential observation—the conclusion available to the jury—is much more limited: the Jorgenson incident informed the county that a guard had engaged in prohibited sexual conduct towards female inmates. With that information in hand, the one option unavailable to Polk County was the one it chose—doing nothing.

The majority relies extensively on our recent decision in *Doe v. Vigo County, Indiana*, 905 F.3d 1038 (7th Cir. 2018) to make the point that notice of a handful of prior incidents of misconduct by employees does not support a finding of a municipality's deliberate indifference to coerced sexual activity. I see the cases as light years apart. There the record showed one incident of sexual assault committed in a public park by a park maintenance employee against a female volunteer, as well as notice of past misconduct by county employees working in a range of largely dissimilar positions throughout the county, including as a highway supervisor, county recorder, and jail guard. *Id.* at 1041, 1045. This evidence fell well short of establishing *Monell* liability against Vigo County. See *id.* at 1045–46.

Here, though, the jury confronted the altogether different setting of a jail and the conduct of male guards toward female inmates. And here, but not in *Vigo County*, the jury heard evidence that Polk County, before learning of Christensen's egregious wrongdoing, received clear notice of serious and

repeated sexual misconduct carried out within the same jail by an employee in precisely the same position as Christensen.

The context here matters for yet another reason. The county's decision to do nothing in response to the Jorgenson incident occurred against the backdrop of its affirmative duty to protect those inmates entrusted to its custody. See *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017) ("[W]hen the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being.") (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). In light of this duty, and with knowledge that its policies aimed at preventing the sexual harassment and abuse of female inmates by guards were being disregarded, Polk County could not stand still. It was required to ensure that "a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance." *Glisson*, 849 F.3d at 382. A rational jury could have found that the county fell short of doing so. Even more specifically, the jury could have concluded that Polk County was aware that its mere proscriptions on sexual contact between guards and inmates had proved insufficient at preventing the sexual exploitation of at least one female inmate by a male guard. Deciding to do nothing once it had that information, a rational jury could have found, reflected deliberate indifference on the county's part. See *Canton*, 489 U.S. at 390.

B

The much harder question is the one that comes next under *Monell*—causation and, specifically, whether Polk

County's deliberate indifference was the "moving force" behind the repeated and undetected sexual assault of J.K.J. and M.J.J. by Christensen. *Monell*, 436 U.S. at 694. That standard, the Supreme Court has underscored, is demanding and requires proof of "a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.

At trial J.K.J. and M.J.J. faced the difficult reality that Christensen, despite knowing his conduct was a crime and violated the jail's policies, repeatedly raped and sexually assaulted them anyway. And, as the majority is right to emphasize, Christensen also went to lengths to conceal his conduct. These facts make it tempting to view the plaintiffs' injuries as the result of a lone bad actor's knowing decision to disregard the law and the county's policies.

The evidence permits another view, though. Christensen's actions cannot be separated from the broader context in which they occurred: J.K.J. and M.J.J.—female inmates in Polk County's custody—faced a very real risk of sexual assault by guards. Wisconsin law recognizes that risk by making it a crime for a guard to engage in any sexual contact with an inmate in any circumstance. See Wis. Stat. § 940.225(2)(h). For their part, Polk County jail administrators likewise recognized the clear risk of inmates being sexually assaulted. More to the point, following the Jorgenson investigation, Polk County knew the risk was far from hypothetical. To the contrary, the Jorgenson incident showed the county that the existence of a written policy prohibiting sexual contact between guards and inmates was insufficient to prevent the sexual harassment and abuse of inmates by guards.

And this is precisely where the jury could have determined the county fell short. It neither conducted meaningful training aimed at preventing and detecting sexual assault nor monitored its employees' compliance with its policies. On this evidence, a rational jury could have found that the plaintiffs' injuries were the "highly predictable consequence" of the deliberate path of inaction that the county pursued by not providing more training or monitoring to prevent the sexual assault of female inmates. *Connick*, 563 U.S. at 64 (quoting *Brown*, 520 U.S. at 409).

## II

What worries me about today's decision is that, as a very practical matter, municipalities may conclude that there is not much to be done to stop a rogue guard from engaging in secretive and heinous conduct in violation of a bright-line policy prohibiting sexual contact with inmates. That view would be as mistaken as it is dangerous, for cities and counties have a meaningful responsibility and role to play in preventing the sexual abuse of inmates in their custody by the guards they employ. That promise comes from the Eighth Amendment. While not every incident of abuse will be preventable, a jail's decisionmakers are not free to choose—through their deliberate decisions on enforcement and training related to the jail's policies—to leave unaddressed a known and material risk of sexual assault to inmates under the jail's care.

Each of these observations follows from the evidence before the jury and, in this way, can be seen as embodied in the jury's verdict against Polk County. I would leave that verdict in place and therefore respectfully dissent from the court's decision to the contrary.